332 F.2d 992
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION and Local 1355,
International Longshoremen's Association, Respondents.
Ocean Shipping Service, Ltd., Intervenor.
 No. 9444.
 United States Court of Appeals Fourth Circuit.
 Argued May 1, 1964.
Decided May 21, 1964.
 
 Stephen B. Goldberg, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N.L.R.B., on the brief), for petitioner.
 John J. O'Connor, Jr., Baltimore Md. (O'Connor & Preston, Baltimore, Md., on the brief), for respondent, Local 1355, I.L.A.
 Seymour M. Waldman, New York City (Louis Waldman and Martin Markson, New York City, on the brief), for respondent International Longshoremen's Assn.
 Before SOBELOFF, Chief Judge, and BRYAN and J. SPENCER BELL, Circuit judges.
 SOBELOFF, Chief Judge.
 
 
 1
 In its petition to this court the National Labor Relations Board seeks enforcement of an order against the International Longshoremen's Association and its Local 1355 (together designated as ILA) to cease and desist from certain conduct characterized by the Board as unfair labor practices violative of section 8(b)(4)(ii)(B) of the National Labor Relations Act.[1] ILA cross-petitions the court to review and set aide the Board's order.
 
 
 2
 To comprehend the legal substance of the 'secondary boycott' complaint lodged against ILA and the basis for the Board's asserted jurisdiction it is necessary to detail the stipulated facts. On October 8, 1962, when the Cuban missile crisis was at its height, ILA made public a policy of refusing to load either American or foreign ships that were trading or had traded with Cuba. The press release issued on that day stated, in part, that:
 
 
 3
 'The International Longshoremen's Association will not load or unload U.S. Government, commercial or cargoes of any nature in ships of any owner whose vessels are used in trade with Cuba.'
 
 
 4
 Four months later, on February 5, 1963, National Security Action Memorandum No. 220 was issued, prohibiting individual foreign-flag vessels that had traded with Cuba from carrying United States Government financed cargoes. Pursuant to this policy statement the Maritime Administration, an arm of the Department of Commerce, prepared a list, commonly known as the 'black list,' of vessels which had been used in trade with Cuba. One of the named ships was the 'Tulse Hill,' a British flag vessel manned by an alien crew and owned by Ocean Shipping Service Ltd. (Ocean), a Bermuda corporation engaged in the business of transporting cargo in foreign commerce and an intervenor in this enforcement proceeding.
 
 
 5
 In furtherance of its declared policy ILA circulated in December, 1963, to its International Officers and Local presidents an 'LIA Fact Sheet' containing the following remarks:
 
 
 6
 'Our Cuban Boycott is still in effect and has been sanctioned by government action. If any of the ships listed below arrive at any ILA port, our membership is forbidden to handle them. Any ship on the list that enters an ILA port, should be reported immediately to * * * International Headquarters, in New York City * * *. Be vigilant * * * Report any of these ships that enter your port * * * By no means work them.'
 
 
 7
 Appended to the Fact Sheet was a list of vessels used in trade with Cuba. This list, based upon the Department of Commerce black list, likewise included the 'Tulse Hill.'
 
 
 8
 While the 'Tulse Hill' had in fact traded with Cuba during 1963 and, for that reason, was black listed by both the Maritime Administration and ILA, this vessel regained eligibility to carry government-financed cargoes on December 20, 1963. This step was taken by the government agency upon receiving assurances from the owners of the vessel that, subject to certain conditions not related to this inquiry, 'no other vessels under their control' would be employed in the Cuba trade.
 
 
 9
 Thereafter, on January 17, 1964, an executive vice president of ILA sent the following telegram to the ILA Vice President and Port Organizer for the Port of Baltimore and to the Atlantic Coast District Vice President:
 
 
 10
 'A British ship named Tulse Hill is due to arrive in Baltimore by Monday, Jan. 20. This ship has been to Cuba and is not to be loaded according to present ILA policy. Contract me when ship arrives for further instructions.'
 
 
 11
 Three days later the owners of the 'Tulse Hill' notified the Maryland Ship Ceiling Company, Inc. (Maryland Ship) that she would arrive in Baltimore on January 21, 1964. This notification was given so that Maryland Ship, a company engaged in the business of fitting vessels to receive cargo, could make preparations for constructing certain wooden 'feeder boxes' and other fittings appropriate for hauling a cargo of grain.
 
 
 12
 The manager of Maryland Ship there-upon telephoned Local 1355 to place an for five gangs of carpenters to start work the next day. This was the customary practice under the hiring hall agreement between Maryland Ship and Local 1355.[2] The Local's business agent answered: 'We can't touch the boat. She has been running to Cuba and the ship is on the black list.' Similar responses were made to subsequent requests for workers to service the 'Tulse Hill.' However, at all times Local 1355 continued to refer employees to Maryland Ship for work aboard vessels other than the 'Tulse Hill.' No attempt was made by Maryland Ship to secure workers outside the hiring hall. The record does not explain why no such attempt was made nor is it clear whether it would have been effective.
 
 
 13
 Instead, Ocean filed a complaint against ILA in the Circuit Court of Baltimore City seeking an ex parte injunction, final injunction and damages. Relief was denied by that court on January 23, 1964, and the complaint dismissed without prejudice. Ocean thereupon filed unfair labor practice charges with the Regional Director of the NLRB on January 27. The complaint stated, in substance, that ILA had 'threatened, coerced or restrained Maryland Ship Ceiling Company with an object thereof of forcing or requiring Maryland Ship Ceiling Company or its employees to * * * cease doing business with Ocean Shipping Service Ltd.' in violation of section 8(b)(4)(ii)(B) of the Act. While the case was pending before the Board it petitioned the District Court for the District of Maryland for an injunction under section 10(l) of the Act. The court heard testimony and argument and, on March 12, 1964, granted the requested injunction, but on March 19 stayed it decree for ten days so that application could be made to this court for a further stay pending appeal. On March 30, 1964, this court continued the stay until the forthcoming term, which began on April 13. In the meantime, the Board at our suggestion and with the cooperation of the parties expedited the unfair labor practices proceeding, dispensing with the customary hearing before a trial examiner.[3] With dispatch, the Board on April 10, 1964, entered the cease and desist order which is the subject of the present proceedings. We heard the appeal on May 1, the earliest day convenient for the parties.
 
 
 14
 The petition for enforcement presents questions, serious and novel, as to the jurisdiction of the Board and as to the correctness of its conclusion that ILA was engaging in unfair labor practices. We shall consider first the jurisdictional point.
 
 THE BOARD'S JURISDICTION
 
 15
 The union has argued that the Board lacks jurisdiction over the subject matter. It is said first that because the 'Tulse Hill' is a foreign-flag vessel manned by an alien crew and because her owner, Ocean, seeks to invoke the Board's aid, this controversy is not one 'affecting commerce' within the meaning of the Act. We do not accept this broad proposition. In McCulloch v. Sociedad Nacional de Marineros de Honduras, 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963); Incres S.S. Co. v. International Maritime Workers, 372 U.S. 24, 83 S.Ct. 611, 9 L.Ed.2d 557 (1963); and Benz v. Compania Naviera Hidalgo, S.A., 353 U.S. 138, 77 S.Ct. 699, 1 L.Ed.2d 709 (1957), the cases relied upon for this purpose by ILA, the Supreme Court declared the Board without jurisdiction over labor relations between owners of foreign-flag vessels and their foreign crews. These cases all relate to shipboard labor relations, something very different from the present case.
 
 
 16
 The more important attack on the Board's jurisdiction is that we have here no 'labor dispute' as the law defines it. Beyond doubt the National Labor Relations Act, as amended, is designed 'to regulate the conduct of people engaged in labor disputes.' Marine Cooks & Stewards v. Panama S.S. Co., 362 U.S. 365, 372, 80 S.Ct. 779, 784, 4 L.Ed.2d 797 (1960). The Act is replete with references to the term 'labor dispute' and section 2(9) provides a definition of this phrase.
 
 
 17
 '(9) The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee.' 29 U.S.C.A. 152(9).
 
 
 18
 The Act has been interpreted as conferring Board jurisdiction over a variety of labor matters, but there can be no jurisdiction where the complaint presents a controversy unrelated to the resolution of a 'labor dispute' as defined. We think that this is the case here.
 
 
 19
 Essentially, Ocean's grievance relates to actions of ILA which are political in nature. As the NLRB found, ILA was implementing a 'clearly defined policy calculated to eliminate trade with Cuba.' Dissatisfaction with ILA's policy of refusing to work ships that have engaged in trade with Cuba does not constitute a controversy grounded in the 'terms and conditions of employment.' Not every activity of a labor organization, not even every controversy in which it may become involved, is a 'labor dispute' within the statutory meaning. Cf. N.L.R.B. v. Miranda Fuel Co., 326 F.2d 172, 180 (2d Cir. 1963). Terms and conditions of employment are not in dispute here. The union activity here pertains to a general political question, in which ILA shares an interest with all citizens. It is not seeking to alter any terms or conditions of employment.
 
 
 20
 The point relied on by ILA is not merely the absence of a labor dispute with a primary employer, as the Board's opinion states. The point is rather the absence of any 'labor dispute' as the statute defines it, namely, a dispute concerning 'terms or conditions of employment.' The Board's decision does not squarely meet the precise issue. It touches it only obliguely by saying that there 'is no merit to the Respondent's contention that this Section 8(b)(4)(B) may not be applied in the absence of a labor dispute with a primary employer.' ILA's emphasis that there is no 'labor dispute' within the definition, either with Ocean or Maryland Ship, is not answered. The existence of a 'labor dispute,' the indispensable prerequisite to jurisdiction, is simply assumed by the Board. Implied in the Board's pronouncement is the notion that whenever a union calls a work stoppage or refuses to supply labor there is a 'labor dispute.' We cannot accept this view.
 
 THE ALLEGED UNFAIR LABOR PRACTICES
 
 21
 Our above-stated conclusion that the Board lacks jurisdiction leads to the result that its petition must be dismissed. However, as we are dealing with a case of first impression and one likely to be offered for review on certiorari, we deem it appropriate to consider further questions that would arise if the Supreme Court should take a different view of the jurisdictional issue.
 
 
 22
 Assuming for the purpose of the discussion that the Board properly took jurisdiction of Ocean's complaint, the question remains whether ILA's activity was an unfair labor practice within the purview of section 8(b)(4)(ii)(B). The Board concluded as follows:
 
 
 23
 'We are satisfied and find that the General Counsel has established that Respondent Local 1355, on instructions from Respondent ILA, informed its members not to work the 'Tulse Hill,' and refused, contrary to past practice under the governing hiring-hall arrangement, to furnish to Maryland Ship work gangs for this purpose. Such action constituted threats, restraints, and coercion within the meaning of Section 8(b)(4)(ii) of the Act. The evidence also reveals that this conduct had an object falling within the plain terms of Section 8(b)(4)(B), i.e., 'forcing or requiring any person * * * to cease doing business with any other person * * *.' The refusal to refer work gangs had the effect of denying Maryland Ship its customary work force, and those employees on which it depended, to perform the services required by its agreement with Ocean's agent. Moreover, this action was an implementation of Respondent ILA's clearly defined policy calculated to eliminate trade with Cuba by withholding the labor of its members from ships that had engaged in such trade.'
 
 
 24
 The section of the Act which ILA is here alleged to have violated makes it an unfair labor practice for a union to 'threaten, coerce, or restrain any person engaged in commerce' if an objective thereof is to force or require any person 'to cease doing business with any other person.' This has been called 'one of the most labyrinthine provisions ever included in a federal statute,'[4] and a literal reading of the section does not provide ready answers to the many problems of interpretation that have arisen. Section 8(b)(4) must be interpreted, not merely read literally. Local 761, Intern Union of Electrical Workers, etc. v. N.L.R.B., 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).[5] To have a violation two elements must be present: (1) the threats, coercion, or restraint; and (2) an objective of requiring a neutral employer to cease doing business with another person. In the setting of our case, the Board asserts that Maryland Ship, which it treats as the 'secondary employer,' is being forced to stop doing business with Ocean, which it deems the 'primary employer,' by the coercive tactics of ILA.
 
 
 25
 To begin with, we fail to find support in the record for the proposition that ILA has engaged in threats, coercion, or restraint against Maryland Ship. In the present circumstances the refusal to refer ship ceilers to the 'Tulse Hill' is not of itself coercive. ILA has not thrown a picket line around the vessel or the premises of Maryland Ship. There is no strike against Maryland Ship nor has the latter been prevented from working on the ship with labor obtained elsewhere. No other union has been told or requested not to work the 'Tulse Hill.' The members of Local 1355 have merely declined to accept employment aboard a ship deemed tainted by having engaged in Cuban trade. These members were informed by the Local 1355 Business Agent of Maryland Ship's requests for workers. The Agent posted Maryland Ship's work orders along with orders for other available work, but the men, in the implementation of union policy, simply would not work on the 'Tulse Hill.' They took no other measures against Maryland Ship.
 
 
 26
 While it might conceivably be an unfair labor practice for the union to institute a general work stoppage against Maryland Ship, no such extreme action has been resorted to here. Absent aggravating circumstances-- none such are shown in this record-- refusal to work on the 'Tulse Hill' cannot be construed as 'threats,' 'coercion' or 'restraint,' within the intendment of the Act. Indeed, if the bare refusal to work in the circumstances shown should be held illegal, the union would be deprived of its right of expression and the proviso of section 8(b)(4)(ii)(B) would be emptied of meaning.
 
 
 27
 Cases that have been cited in which the refusal to refer laborers has been found within the meaning of the term 'coerce and restrain' are not persuasive in the present context. For example, in Local No. 5, United Ass'n of Journeymen, etc. v. N.L.R.B., 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), the court specifically declined to 'pass on the contention * * * that any refusal to refer employees is to coerce or restrain.' It decided, however, that under the circumstances of that case the refusal to refer, accompanied by the Local's inducement of employees of the secondary employer not to work on the construction project involved, was coercive. 321 F.2d at 370. We are advertent to the Third Circuit decision in N.L.R.B. v. Local 825, Unt'l Union of Operating Eng's, 315 F.2d 695 (3d Cir. 1963). There the court found that 'the language of the statute is without ambiguity and makes it unlawful to refuse to refer under a hiring hall arrangement,' but until there is a decision on this point by the Supreme Court we would respectfully disagree. This is not to say that denying an employer access to a hiring hall may not in other circumstances be an unfair labor practice. We hold only that it is not such in the particular circumstances outlined above.
 
 
 28
 Maryland Ship, it is true, has been inconvenienced by ILA's position. But it bears repeating that the Local has done nothing to prevent Maryland Ship from working on vessels other than the 'Tulse Hill,' or even from resorting to other sources for its labor supply on that vessel. In this regard we perceive an analogy in a union's limited product picketing. In N.L.R.B. v. Fruit & Vegetable Packers, 84 S.Ct. 1063 (1964), the Supreme Court held that 'consumer picketing' of a retail store directed only at the purchasing of apples produced by the primary employer, and not directed at all products handled by the secondary, was not within the proscription of section 8(b)(4) (ii)(B). The Court reviewed the legislative history of the amendments to that section and concluded:
 
 
 29
 'All that the legislative history shows in the way of an 'isolated evil' believed to require proscription of peaceful consumer picketing at secondary sites was its use to persuade the customers of the secondary employer to cease trading with him in order to force him to cease dealing with, or to put pressure upon, the primary employer. This narrow focus reflects the difference between such conduct, and peaceful picketing at the secondary site directed only at the struck product. In the latter case, the union's appeal to the public is confined to its dispute with the primary employer, since the public is not asked to withhold its patronage from the secondary employer, but only to boycott the primary employer's goods. On the other hand, a union appeal to the public at the secondary site not to trade at all with the secondary employer goes beyond the goods of the primary employer, and seeks the public's assistance in forcing the secondary employer to cooperate with the union in its primary dispute.' 84 S.Ct. at 1066.
 
 
 30
 To us this language is suggestive at least as to the proper legal treatment of the very limited refusal to work shown here. Maryland Ship has not been coerced or restrained from working any other ships, even Ocean's, until the disagreement between Ocean and ILA is settled. It has been precluded only from obtaining ILA workers aboard one vessel because, in the picturesque though inelegant words of one union member, the workers 'don't want to carry any lice home.' The only pressure exerted by ILA has been to refuse to furnish 'day-to-day service essential to the employer's regular operations.' United Steelworkers of America v. N.L.R.B., 84 S.Ct. 899 (1964).
 
 
 31
 Turning to the second element-- the objective of the union's conduct-- the statute makes it unlawful for the labor organization to have as an objective to force or require 'any person * * * to cease doing business with any other person'. 29 U.S.C.A. 158(b)(4)(B). Presumably this means in the present case requiring Maryland Ship to terminate business relations with Ocean. The objective of ILA's activity was not to eliminate all business between these two corporations. The object and purpose of ILA, as the Board expressly found, was its 'clearly defined policy calculated to eliminate trade with Cuba.'
 
 
 32
 The Board went on to say, however, that even if the central and dominating purpose of ILA was other than to force the cessation of business, it was 'at least 'an object' of Respondent's conduct.' We readily agree that it is not necessary to find that this was the union's sole object. N.L.R.B. v. Denver Building & Const. Trades, 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284 (1951). But nothing in the record indicates that ILA stands in the way of Maryland Ship carrying on ordinary business activity with Ocean in regard to such of its ships as have not traded with Cuba. An incidental effect of ILA's conduct has been to contribute to a limitation of business between Maryland Ship and Ocean. Yet it cannot be said that the union has taken any step to broaden its limited objective, which relates only to ships trading with Cuba.
 
 
 33
 We conclude that ILA is guilty of no 'treat, coercion, or restraint' with an objective of forcing a cessation of business between Maryland Ship and Ocean. There is therefore no basis for the application of section 8(b)(4)(ii)(B). We hold that the Board, even if it had jurisdiction, erred in finding an unfair labor practice on the part of ILA.
 
 
 34
 One may disagree with the soundness of ILA's reasons for persistently refusing to work on a ship which has offended its policy in respect to Cuban trade; one may consider its attitude nedlessly severe and its patriotism excessive. But it is not within our province or that of the Board to require the men to engage in work they find obnoxious because the ship has trafficked with a political regime they consider loathsome. Such boycotts by workers or buyers are not uncommon. Similar demonstrations have been made against other Communist governments and against Hitler's Nazi system, but this is a recognized part of the freedom constitutionally guaranteed in our country. The First Amendment affords protection not merely to the voicing of abstract opinions upon public issues. It also protects implementing conduct which is in the nature of advocacy.[6] Union members need not mount a platform to voice their moral revulsion against Castro; if they deem needlessly severe and its patriotism excessive. to express their sentiments by refusing to assist a vessel that trades with him, they are at liberty to do so. Nothing in our labor laws speaks to the contrary.
 
 For the above reasons
 
 35
 Enforcement is denied.
 
 
 36
 ALBERT V. BRYAN, Circuit Judge (dissenting).
 
 
 37
 In my judgment the present controversy fits snugly in the design of the National Labor Relations Act, unequivocally putting jurisdiction of it in the Board. I think, too, its decision was imperatively required by the Act. I would enforce the order.
 
 
 
 [1]
 The Act provides, in relevant part, that it is an unfair labor practice for a union
 '(ii) to threaten, coerce, or restrain any person * * * where in either case an object thereof is * * * (B) forcing or requiring any person to cease * * * dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *.'
 National Labor Relations Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act) 704(a), 73 Stat. 542-543, 29 U.S.C.A. 158(b)(4) (Supp.1963).
 
 
 [2]
 The collective bargaining agreement between Maryland Ship and Local 1355 provided that 'employees shall be hired through the Union Halls maintained by * * *' Local 1355. Permission is given the company to obtain workers from other sources 'when an insufficient number of men are available under the hiring procedure set forth * * *.'
 
 
 [3]
 The parties stipulated to submit the case to the Board, without a hearing before a trial examiner, on the basis of the charges, complaint, answer, various exhibits, and the transcript and exhibits received in evidence at the hearing held in the United States District Court for the District of Maryland on the Board's petition for an injunction. Penello v. International Longshoremen's Ass'n, 227 F.Supp. 164 (D.Md.1964)
 
 
 [4]
 Aaron, 'The Labor Management Reporting and Disclosure Act of 1959' (pt. 2), 73 Harv.L.Rev. 1086, 1113 (1960)
 
 
 [5]
 For a general discussion of the various approaches to the interpretation of this section, see Lesnick, 'The Gravamen of the Secondary Boycott,' 62 Col.L.Rev. 1363 (1962)
 
 
 [6]
 Brotherhood of Railroad Trainmen v. Virginia, 84 S.Ct. 1113 (1964); N.A.A.C.P. v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Garner v. Louisiana, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207 (1961); N.A.A.C.P. v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); Thomas v. Collins, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430 (1945)