## BALTIMORE BUILDING AND CONSTRUCTION TRADES COUNCIL ET AL. *v.* MARYLAND PORT AUTHORITY

(Three Appeals in One Record)

[No. 167, September Term, 1964.]

*Decided April 2, 1965.*

The cause originally was argued before HAMMOND, HORNEY, MARBURY, SYBERT and OPPENHEIMER, JJ., and reargued before PRESCOTT, C. J., and HAMMOND, HORNEY, MARBURY, SYBERT and OPPENHEIMER, JJ., and POWERS, J., Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Cosimo C. Abato* (on both arguments), with whom were *Bracken, Abato & Mogowski* on the brief, for the Baltimore Building and Construction Trades Council, one of the appellants.

*Charles B. Heyman* (on both arguments), with whom was *Sol C. Berenholtz* on the brief, for the Seafarers International Union of North America, another appellant.

*Bernard W. Rubenstein* (on both arguments), with whom was *Jacob J. Edelman* on the brief, for the Freight Drivers and Helpers Local No. 557, the other appellant.

*William L. Marbury* and *Franklin G. Allen* (on both arguments), with whom were *Piper & Marbury* on the brief, for the appellee.

HAMMOND, J., delivered the opinion of the Court.

Upon application of the Maryland Port Authority, the Circuit Court of Baltimore City issued, ex parte, a preliminary restraining order, which it later made permanent, enjoining, (a) the Baltimore Building and Construction Trades Council from maintaining a picket line or picket boat at the terminals of the Authority for the purpose of inducing the Authority "* * * to require any contractor working on construction contracts at the said terminals to pay its employees the prevailing or union wages * * *," and (b) the Freight Drivers and Helpers Local No. 557 and the Seafarers International Union of North America from "* * * advising persons attempting to deliver freight to said terminals, or attempting to pick up freight at said terminals, or attempting to dock or undock ships carrying freight or passengers to or from said terminals, that any picketing or patrolling conducted in violation of this order is legitimate."

In their appeal the three Unions contend: (1) that the preliminary restraining order was void ab initio because the provisions of Code (1964 Replacement Volume 8B), Art. 100, Secs. 63-75, dealing generally with injunctions in labor disputes, were not complied with;[1] (2) that both the preliminary order and

---

1. These Maryland statutes, sometimes referred to as the State Norris-LaGuardia Act, provide in Sec. 68 (h) for notice of the application for a preliminary restraining order, in Sec. 68 (i) that such an order shall be effective for no longer than five days, in

the permanent injunction were void because the court lacked jurisdiction to issue them under Sec. 65 of Art. 100 of Code; (3) that the Circuit Court lacked jurisdiction to issue the preliminary order and the permanent injunction because Congress has confided to the National Labor Relations Board sole and exclusive right and power, in the first instance, to deal with the activities enjoined by that court; (4) that the Circuit Court erred in finding an unlawful purpose in the picketing by the Building Trades Council; and (5) that the enjoining orders unconstitutionally deprive the other two Unions of the right of free speech.

We are persuaded that the contention of federal preemption of the right and power of the state to determine originally the lawfulness of the activities of the Unions complained of by the Port Authority is sound and controlling and, therefore, do not reach the other questions posed.

At the hearing below, the Unions offered no evidence. The Port Authority, which is an instrumentality of the State of Maryland performing essential governmental functions having as their principal purpose the promotion of commerce, Code (1964 Replacement Volume 5), Art. 62B, Secs. 1 and 3 a, produced witnesses who testified to the following facts.

The Authority owns and operates the Dundalk Marine Terminal and the Locust Point Marine Terminal, both on the shore of the Baltimore harbor. Through these terminals pass general import and export cargo from and to all parts of the world. As early steps in an extensive program of additions and improvements to its facilities, estimated to cost in total $30,000,000, the Authority in December 1963 awarded a contract for modification of the heating system at Locust Point to the J. H. Lawrence Co. (Lawrence), and in April 1964 a contract for construction of a bulkhead and appurtenances, to be built at Dundalk at a cost of $3,130,000, to McLean Contracting Company (McLean). In January 1964 the president of the Trades Council told the Deputy Director of

---

Sec. 68 (j) that no such order shall be issued except upon the filing of a bond, and in Sec. 70 that no such order shall be granted except on the basis of findings of fact.

Engineering and Planning for the Authority that he disagreed with a ruling of the general counsel of the Authority that it could not legally include a prevailing wage clause in its construction contracts, that the lack of such a clause made it difficult for the Union to keep standards in the area at a proper level and that unless the situation was rectified "there may be tie-ups of the port facilities of the Authority." On April 22, 1964, the Attorney General of Maryland issued an opinion which the Authority had asked for, holding that it would be illegal for the Authority to require a prevailing wage clause in its contracts without express legislative authorization.

On the morning of Tuesday, May 12, 1964, pickets acting for the Trades Council appeared at the gates of the Dundalk and Locust Point Terminals. They carried signs headed "Notice to the Public" which, at Dundalk, read: "Employees of McLean Contracting Co. do not receive union wages, benefits and conditions.—Baltimore Building and Construction Trades Council" and, at Locust Point, read the same except that Lawrence's name appeared instead of McLean's, although no employees of Lawrence then were on the job, the contract having been completed except for details to be later attended to. The pickets passed out leaflets, also headed "Notice to the Public" which recited, over the signature of the Trades Council, that wages and conditions of employment of employees of McLean or Lawrence, depending on the terminal at which they were distributed, were below those the Union had established and was attempting to establish in the area for similar work, and gave various specific examples. The handbills then said:

> "The sole purpose of patrolling this site is to inform the public that McLean Contracting Co. is not paying the prevailing rate of pay nor providing the prevailing conditions of employment to its employees.
> "THIS NOTICE IS ADDRESSED ONLY TO THE PUBLIC. IT IS NOT ADDRESSED TO ANY EMPLOYER OR TO ANY EMPLOYEES. We are not attempting to organize employees of McLean Contracting Co. nor are we attempting to obtain recognition or bargaining for them. Nor is there any

intent or attempt to induce or encourage any employee of any employer to refuse to work, transport or otherwise handle or work on any materials, etc. No one is requested to cease doing business with any person.

"We believe that the public should be familiar with what is going on and that is the sole purpose of the patrolling."

At first the pickets at the gates of the terminal permitted trucks bringing in export freight or coming to pick up imports to pass without protest. On Wednesday, May 13, they began to turn trucks back by holding up a sign "Call EA 7-3700." Most of the truck drivers would stop, leave their trucks to make a telephone call and then drive away without entering the terminal. On the afternoon of May 13, some one hundred forty trucks drove up to the gate at Locust Point and only about forty crossed the picket line. An employee of the Authority called EA 7-3700 on the morning of May 13, pretending to be a truck driver asking for instructions, and was advised that he had called Freight Drivers and Helpers Local No. 557 and was told to use his own judgment whether to cross the picket line, but that he would be protected in his job if he refused to do so. He called again in the afternoon and was told not to cross the line.

On Tuesday, May 12, the day the picketing began at the terminal gates, the Trades Council stationed a picket boat in the harbor off the Dundalk terminal. On that day the crew—members of the Seafarers International Union—of one of two tugs dispatched by their owner, the Curtis Bay Towing Co., to assist in docking the SS Ames Victory at Dundalk, refused to pass the picket boat. The following day the ship was assisted by tugs in leaving the Authority's pier only after the president of the Trades Council withdrew the picket boat because the Ames Victory was carrying military cargo.

On May 13 the SS Argentina, a cruise ship returning from Bermuda—on which, among many other holiday passengers, was the Governor of Maryland—had to be diverted from its intended dock at the Dundalk terminal to Pier 1 of the Pennsylvania Railroad Company, with much attendant delay, frus-

tration and confusion to the homecoming passengers, because the port agent of the Seafarers Union advised the Curtis Bay Towing Company that his Union considered the picket boat to have established "a legitimate picket line." He said he had so advised the employees of the towing company (who were members of his Union) and that good union men would not cross a legitimate picket line.

The preliminary restraining order was issued shortly after noon on May 14 by Judge Barnes, and a hearing was held on May 15, at which the testimony produced by the Authority, summarized above, was received. Judge Barnes made findings that "* * * the purpose of the picket signs and the notice to the public used by the Baltimore Trades Council was to tie up the facilities of the Authority and to force the Authority to insert a prevailing wage clause in its construction contracts, * * *. Although the 'Notice to the Public' is carefully drawn to indicate that its purpose is to inform the public only, its real purpose was to prevent the use of the Authority's facilities and this purpose was accomplished."

Both sides agree that facets of interstate commerce necessary as a basis for federal jurisdiction are here present, and the picketing both on land and water was always peaceful; but the Authority seizes on the findings of Judge Barnes as demonstrable reasons why the federal labor laws do not control. It argues first that picketing a state agency to close down its activities in order to influence it to do an act illegal under state law is neither a prohibited nor a protected activity under the federal labor laws but is unlawful under state law and, second, that even if the picketing was protected under the National Labor Relations Act, the state court was not deprived of jurisdiction because the picketing was to compel action which was illegal under the law of Maryland.

On the other hand, the Unions say that their activities were either protected under Sec. 7 of the National Labor Relations Act (29 U.S.C. Sec. 157) or prohibited under Sec. 8 of that Act (29 U.S.C. Sec. 158), and if on either premise this is even reasonably arguable, the Supreme Court has held definitely and unmistakably that as part of a national policy Congress has confided the original determination of such questions to the Na-

tional Labor Relations Board to the complete exclusion of state courts or agencies.

We think the Unions are right. In *Garner v. Teamsters, C. & H. Union,* 346 U. S. 485, 98 L. Ed. 228 (1953), the union peacefully picketed a trucking company's loading platform in order, the trial court found, to coerce the company into compelling or influencing their employees to join the union. Drivers of other employers refused to cross the picket line and the trucker's business fell off as much as ninety-five per cent. The Supreme Court of Pennsylvania reversed the injunction which the trial court had issued, on the finding that the picketing was a violation of the labor laws of Pennsylvania, and the Supreme Court of the United States affirmed, holding that the activities complained of by the trucker fell within the exclusive jurisdiction of the National Labor Relations Board and that, therefore, state remedies were precluded. Justice Jackson, for the Court, pointed out that this was not a case of violence or mass picketing where the state could exercise its historic powers over traditionally local matters of public safety and order and use of streets and highways,[2] and then said (pp. 488-491 of 346 U. S.) :

---

2. The Supreme Court consistently has held that the National Labor Relations Act does not prohibit a state from dealing with violence and its consequences. United Workers v. Laburnum Corp., 347 U. S. 656, 98 L. Ed. 1025 (1954); Automobile Workers v. Russell, 356 U. S. 634, 2 L. Ed. 2d 1030 (1958); San Diego Bldg. Trades Council v. Garmon, 359 U. S. 236, 3 L. Ed. 2d 775, 784-785 (1959); Teamsters Local 20 v. Morton, 377 U. S. 252, 12 L. Ed. 2d 280, 285 (1964). Also see Solo Cup v. Int'l Brotherhood, 237 Md. 143 (1964).

State courts also have jurisdiction to enjoin an "agency shop" clause as illegal under a state right to work law. Retail Clerks v. Schermerhorn, 375 U. S. 96, 103, 11 L. Ed. 2d 179 (1963). There the Supreme Court said Congress could preempt as much or as little of the interstate field as it chose and under Sec. 14 (b) of the Labor Relations Act, Congress left the states free to enact laws prohibiting agency shops and "* * * we can only assume that it intended to leave unaffected the power to enforce such laws." It added that this holding was not "* * * at war with San Diego Council v. Garmon, 359 U. S. 236, 3 L. Ed. 2d 775, 79 S. Ct. 773, decided in 1959, and holding that where action is 'arguably sub-

"Congress has taken in hand this particular type of controversy where it affects interstate commerce. * * * It is not necessary or appropriate for us to surmise how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body. The power and duty of primary decision lies with the Board, not with us. * * *

"Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties. It went on to confide primary interpretation and application of its rules to a specific and specially constituted tribunal and prescribed a particular procedure for investigation, complaint and notice, and hearing and decision, including judicial relief pending a final administrative order. Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. * * * A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same reasoning which prohibits federal courts from intervening in such cases, except by way of review or an application of the federal Board, precludes state courts from doing so."

In *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 99 L. Ed. 546 (1955), a labor union picketed an employer's plant to compel him to add to a contemplated collective labor agree-

---

ject to Sec. 7 or Sec. 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board.'" See also Smith v. Evening News Asso., 371 U. S. 195, 9 L. Ed. 2d 246 (1962), for a similar holding that Sec. 301 of the Taft-Hartley Act (29 U.S.C. Sec. 185 (a)) gives the states concurrent jurisdiction over an unfair labor practice which also violates a collective bargaining agreement and that this holding is not at war with Garmon.

ment a clause obligating him to employ, for the repair or replacement of machinery, only contractors who had collective agreements with the union. The employer filed a charge of unfair labor practice under Sec. 8 (b) (4) (D) of the Labor Management Relations Act. The Board refused to act, holding that the section invoked had not been violated. While the charge was pending before the Board, the employer sought an injunction in a Missouri state court which later issued it. More than a year after the Board had refused to act, the Supreme Court of Missouri affirmed on the ground that the union's activities violated the state's restraint of trade act, treating the Board's ruling as a determination that there was no basis for a charge of unfair labor practice under the Labor Management Relations Act. The Supreme Court of the United States held that the state court's jurisdiction to enjoin the union's conduct was preempted by the federal labor laws. The Court held that the determination of the Board that Sec. 8 (b) (4) (D) did not apply, did not necessarily mean also that subsections (A) or (B) of Sec. 8 (b) (4) had or had not been violated. It said (pp. 478 and 479 of 348 U. S.) :

"The point is rather that the Board, and not the state court, is empowerd to pass upon such issues in the first instance. * * *

"Nor is it within our competence now to determine whether the conduct in controversy is subject to the authority of Subsections (A) or (B). Under the Board's decisions, for example, it may become pertinent whether *this is eventually deemed primary pressure, directed at respondent to force insertion of the disputed clause in its contract with the IAM, rather than secondary pressure, aimed at subcontractors to force them to use IAM labor*. We are not now ruling on that distinction. However, the point is pertinent to our discussion, because even if it were clear that no unfair labor practices were involved, it would not necessarily follow that the State was free to issue its injunction. If this conduct does not fall within the prohibitions of § 8 of the Taft-Hartley Act, *it may*

*fall within the protection of § 7, as concerted activity for the purpose of mutual aid or protection."* (Emphasis supplied)

The Supreme Court went on to deal with the argument of the employer that *Garner* did not control because there the State and Congress both were attempting to regulate labor relations as such, while in *Weber* Missouri was not prohibiting labor's conduct for any reason having to do with labor relations but, rather, because that conduct contravened a state law which dealt generally with restraint of trade. This argument was disposed of on the assumption that the union's activities were prohibited by saying (p. 479 of 348 U. S.) : "We do not think this distinction is decisive." On the assumption that the union's conduct was protected, the Court said (pp. 480 and 481 of 348 U. S.) :

"Moreover, we must not forget that this case is not clearly one of 'unfair labor practices.' Certainly if the conduct is eventually found by the National Labor Relations Board to be *protected* by the Taft-Hartley Act, the State cannot be heard to say that it is enjoining that conduct for reasons other than those having to do with labor relations. * * * Regarding the conduct here in controversy, Congress has sufficiently expressed its purpose to bring it within federal oversight and to exclude state prohibition, even though that with which the federal law is concerned as a matter of labor relations be related by the State to the more inclusive area of restraint of trade."

The Supreme Court pulled together and precisely restated the effect of its earlier holdings in *San Diego Building Trades Council v. Garmon*, 359 U. S. 236, 3 L. Ed. 2d 775 (1959). There the trial court found as facts the following: (1) the unions sought from the Garmons (three members of the family were respondents) an agreement to continue to employ only those workers who were already members of the unions or who applied for membership within thirty days; (2) the Garmons refused, claiming that none of their employees appeared to de-

sire to join a union and, in any event, as a prerequisite, one of the unions must be designated as a collective bargaining agent; (3) the union began immediately to peacefully picket the Garmons' place of business and to exert pressure on customers and suppliers in order to persuade them to stop dealing with the Garmons; and (4) *"The sole purpose of these pressures was to compel execution of the proposed contract."* (P. 237 of 359 U. S., emphasis supplied)

The unions had contested these findings, claiming that their only purpose in picketing was to educate the workers and persuade them to become members. The trial court enjoined the unions from picketing and applying other pressures until one of them had been properly designated as bargaining agent, and awarded the Garmons $1,000 as damages. The California Supreme Court affirmed. The Supreme Court of the United States granted certiorari and remanded the case, 351 U. S. 923, 100 L. Ed. 1453 (1956), deciding that federal preemption prevented the state injunction but leaving open the matter of damages under California law. On remand, the Supreme Court of California sustained the award as damages for a tort. Certiorari was again granted and the Supreme Court reversed, saying (at p. 246 of 359 U. S.) :

> "Since the National Labor Relations Board has not adjudicated the status of the conduct for which the State of California seeks to give a remedy in damages, and since such activity is arguably within the compass of § 7 or § 8 of the Act, the State's jurisdiction is displaced."

The opinion previously had quoted much of what was quoted above from *Garner* and, in addition, said (pp. 244-246 of 359 U. S.) :

> "When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. * * *

"At times it has not been clear whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections. But courts are not primary tribunals to adjudicate such issues. It is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board. What is outside the scope of this Court's authority cannot remain within a State's power and state jurisdiction too must yield to the exclusive primary competence of the Board. * * * In the absence of the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction."

The Supreme Court has continued to follow faithfully the path it charted in the cases we have discussed.

*Marine Engineers Ben. Asso. v. Interlake S. S. Co.,* 370 U. S. 173, 8 L. Ed. 2d 418 (1962), dealt with a situation in which the Supreme Court of Minnesota found that a lower Minnesota court had not erred in enjoining, as violative of state law, peaceful picketing against a vessel of a steamship company, the employees of which were unorganized, since it found the parent union and its local not to be (p. 174 of 370 U. S.) :

"* * * 'labor organizations' within the meaning of § 8 (b) of the Labor Management Relations Act, 29 U. S. C. § 158 (b), and therefore not subject to the unfair labor practice provisions of that section of the statute."

All members of the unions performed supervisory functions only and the findings of the state courts would appear to have been fully justified. The injunction forbad the inducing of employees of others and other companies from performing services for the steamship company and from interfering with its operation. The Supreme Court reversed, saying that the state courts

were not free to make the finding that the federal act did not apply (p. 178 of 370 U. S.) :

"We see no reason to assume that the task of interpreting and applying the statutory definition of a 'labor organization' does not call for the same adjudicatory expertise that the Board must bring to bear when it determines the applicability of §§ 7 and 8 of the Act to substantive conduct."

The Court concluded that "* * * the only workable way to assure this result is for the courts to concede that a union is a 'labor organization' for § 8 (b) purposes whenever a reasonably arguable case is made to that effect."

In *Local No. 438 v. Curry*, 371 U. S. 542, 9 L. Ed. 2d 514 (1963), the Supreme Court reversed the highest court of Georgia (holding the Georgia courts had no jurisdiction) which had approved an injunction against union activity that violated the State's right to work law and also was at least arguably violative of Sec. 8 (b) of the National Labor Relations Act. The facts were that there was peaceful picketing of Curry, a non-union contractor who had a prevailing wage construction contract with the City of Atlanta, to force him, on his version, to hire only union labor or to persuade him, on the union's version, to raise his pay scale to those prevailing in the area. The picketing had followed unsuccessful efforts by the union to have the City of Atlanta persuade Curry to pay higher wages.

See also *Liner v. Jafco, Inc.*, 375 U. S. 301, 11 L. Ed. 2d 347 (1964), which is another reversal of a state court's action in enjoining peaceful picketing which sought to harass a general contractor who used non-union labor. At pp. 309 and 310 of 375 U. S. the Court said:

"Whether or not the facts showed a 'labor dispute' within the meaning of 29 U. S. C. § 152 (9)[6] is

---

[6] The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or

certainly at least arguable. Consequently, as we said in *Curry,* 'the state court had no jurisdiction to issue an injunction or to adjudicate this controversy, which lay within the exclusive powers of the National Labor Relations Board.' "

Another case is *Hattiesburg Bldg. and Trades Council v. Broome,* 377 U. S. 126, 12 L. Ed. 2d 172 (1964), which reversed *per curiam* the Supreme Court of Mississippi which had approved the enjoining of peaceful picketing of an oil refinery by a labor organization to compel it to require a non-union industrial maintenance firm which did work at the refinery to sign an exclusive hiring-hall agreement with the labor organization.

The Port Authority finds solace and strength for its position, as did Judge Barnes below, in cases such as *International Longshoremen's Ass'n v. Georgia Ports Authority,* 124 S. E. 2d 733 (Ga. 1962), *cert. den.* 370 U. S. 922, 8 L. Ed. 2d 503 (1962), in which the court ruled as had the Board in *New Bedford Steamship Authority,* 127 N.L.R.B. 1322, 46 L.R.R.M. 1173 (1960), and *New Jersey Turnpike Authority,* 33 L.R.-R.M. 1528, Case No. 4, R. C. 2245 (1954). See also *So. Atl. Longshoremen v. Harris County Nav. Dist.* (Ct. of Civ. App. of Texas, 1962), 358 S. W. 2d 658, *cert. den.* 372 U. S. 975, 10 L. Ed. 2d 142 (1963) ; *International Brotherhood v. Grand River Dam Auth.,* 292 P. 2d 1018 (Okla., 1956) ; and *City of Alcoa v. International Broth. of Elec. Wkrs.,* 308 S. W. 2d 476 (Tenn., 1957).

These cases, unlike the case at bar, involved disputes or relationships between the employing governmental entity or agency and its own immediate employees. The National Labor Relations Act defines "employer" in Sec. 2 (2) (29 U.S.C. Sec. 152 (2)) and "employee" in Sec. 2 (3) (29 U.S.C. Sec. 152 (3)). Specifically excluded from the category of employers are, among others, "any State or political subdivision thereof," and "any person subject to the Railway Labor Act," and from the

seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

category of employees are excluded inter alia, "* * * any individual employed by an employer subject to the Railway Labor Act * * * or by any other person who is not an employer as herein defined."

Because of these exclusions in the federal act, the cases, such as the *Georgia Ports Authority* case, have held that in instances involving the general employer-employee interrelationships of states and their subdivisions on the one hand and their servants on the other, the state courts and not the National Labor Relations Board have jurisdiction.

The Supreme Court has made it plain, however, that except in instances of labor disputes or differences between state governmental entities and their servants such entities are "persons" which, to the same extent as other non-excluded persons, are fully within the penumbra, and subject to the protection and prohibitions of the federal labor laws.

The holding to this effect was foreshadowed by *Local Union No. 25 v. New York, N. H. & H. R. Co.*, 350 U. S. 155, 100 L. Ed. 166 (1956), which held that a railroad could seek relief before the National Labor Relations Board, although railroads like political subdivisions, are expressly excluded from the definition of the term "employer" in the federal act. The opinion pointed out that "the N.L.R.B. is empowered to issue complaints whenever 'it is charged' that any person subject to the Act is engaged in any proscribed unfair labor practice," and that Board regulations allow such a charge to be filed by "any person," as defined in Sec. 2 (1) of the Act, (29 U.S.C. Sec. 152 (1)). The Court concluded that "* * * since railroads are not excluded from the Act's definition of 'person', they are entitled to Board protection from the kind of unfair labor practice proscribed by Sec. 8 (b) (4) (A)," reasoning that this result would best effectuate congressional policies of uniform control over labor abuses and protection of the parties injured by such practices.

The holding as to states and their political subdivisions was spelled out explicitly in *Plumbers, etc., 298 v. County of Door*, 359 U. S. 354, 3 L. Ed. 2d 872 (1959). There the County of Door, a Wisconsin municipal corporation, was endeavoring to have constructed an addition to its courthouse by one Ouden-

hoven, with whom it had a general contract. There were eight subcontracts, one, for the plumbing, with one Zahn who customarily employed non-union labor. The Plumbers union, disturbed by this, attempted to induce Zahn to sign a union agreement. After he refused, a picket was assigned to walk around the courthouse carrying a sign which set forth that non-union workers were employed on the project. This peaceful picketing effectively stopped all work. Door County, Zahn and Oudenhoven sought an injunction in the local circuit court. The Wisconsin Supreme Court affirmed the issuance of an injunction by the circuit court on the premise that the National Labor Relations Board did not have jurisdiction because Door County, a state subdivision, was among those seeking relief and therefore jurisdiction of the state was not preempted.

The Supreme Court of the United States disagreed, saying there could be no doubt that if Door County were not a party, state courts would have no power over the dispute. The County and its co-plaintiffs alleged an attempt to force Zahn and the County to stop doing business with each other or, alternatively, to coerce Zahn into becoming solely a union employer. The Court said (pp. 356 and 357 of 359 U. S.) :

> "Both of these allegations, if proved, would constitute unfair labor practices under § 8 (b) (4) of the National Labor Relations Act. If the charges are not proved the conduct might well be 'protected' under § 7 of the Labor Act. In either case this Court has held that the determination must be made by the N. L. R. B. and that 'state [courts] must decline jurisdiction in deference to the tribunal which Congress has selected * * *.' "

Justice Black, for the Court, continued (pp. 357-359 of 359 U. S.) :

> "It is claimed, however, that the presence of Door County somehow deprives the Board of jurisdiction and reestablishes state power. This contention is based on the fact that political subdivisions are expressly excluded from the definition of 'employer' in the Labor

Relations Act and therefore are not subject to many of its provisions. * * * In *Local 25* * * *, we decided that a railroad could seek relief before the Board although railroads, like political subdivisions, are expressly excluded from the term 'employer' in the Act. * * *

"The position of a county and a railroad would seem to be identical under the Act, and the policy considerations which guided us in *Local 25,* like the statutory language there construed, would seem to apply equally here. * * * And Board jurisdiction to grant relief, far from interfering with county functions, serves to safeguard the interests of such political subdivisions. * * *

"We do not, of course, attempt to decide whether the Union's conduct in this dispute violates § 8 (b) (4), is protected by § 7, or is covered by neither provision of the Labor Act. Those are questions for the Board to determine in a proper proceeding brought before it."

We are persuaded that neither the Circuit Court nor we have power to determine the conflicting claims of the Port Authority and the Unions. We do not decide or attempt to decide whether Judge Barnes was right or wrong in his decision that the conduct of the Unions that he enjoined was outside the scope of the National Labor Relations Act, only that he had no power at all to make the determination, because on the pleadings and the proof it was reasonably arguable whether the conduct of the Unions was protected or prohibited by the federal Labor Act, or not covered by any of its provisions. Certainly, to use the language of the second *Garmon* case, referred to earlier (p. 246 of 359 U. S.), there is not here any "compelling precedent applied to essentially undisputed facts" which would permit a state court to determine that it and not the Labor Board had initial jurisdiction. Rather, as the cases which have been cited show, the precedents seem to be the other way.

As we see it, a reasonable argument can be made that a labor dispute was in being when the Unions picketed at the terminals

of the Authority. The federal Labor Act in Sec. 2 (9) (29 U.S.C. Sec. 152 (9)) defines a "labor dispute" to include "* * * any controversy concerning terms, tenure or conditions of employment, * * * or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee."

Here the Unions were in a controversy with the Port Authority in which it can reasonably be argued they sought to arrange terms and conditions of employment. In *Liner v. Jafco, supra,* in which the union's objectives were similar, the Supreme Court, referring to the statutory definition of a labor dispute, said as we noted earlier: "Whether or not the facts showed a 'labor dispute' within the meaning of 29 U.S.C. Sec. 152 (9) is certainly at least arguable. *Cf. N. L. R. B. v. International Longshoremen's Asso.,* 332 F. 2d 992 (4th Cir. 1964).

Section 7 of the Labor Act (29 U.S.C. Sec. 157), among other rights, insures to employees "* * * the right * * * to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." The Unions make the claim, which cannot be dismissed as completely frivolous, that their activities are protected by this provision of the federal labor law rather than being prohibited as unfair labor practices by Sec. 8 (b) (4) (B). That section makes it an unfair labor practice for a labor organization or its agents:

> "(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is * * * (B) forcing or requiring any person to cease using, * * * handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees * * *."

By an amendment made in 1959 Congress added the following to the section: "*Provided,* That nothing contained in this clause

(B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing * * *."

Because it does not want the federal law to apply and govern, the Port Authority contends that Sec. 8 (b) (4) (B), the so-called secondary boycott provision, is not apposite because here the picketing was primary and direct against it and was not against Lawrence or McLean with whom the Unions had no dispute. Although the Unions' leaflets referred to Lawrence and McLean and said in terms that there was no intent to or attempt to induce or encourage any employee or any employer "to refuse to work, transport or otherwise handle or work on any materials, etc." and also said "no one is requested to cease doing business with any person," the Unions now argue that Sec. 8 (b) (4) (B) may well apply. We have not been referred to or found any compelling precedent which would permit us to say with certainty that the Unions are wrong in this contention and so permit the State to exercise jurisdiction to determine the answer in the first instance.

The question of whether in a given case union activities are, under the federal labor law, prohibited secondary activities or protected primary activities, or neither, is often a complex one extremely difficult to answer accurately and precisely. The task has not seemingly been made easier by the 1959 amendments to Sec. 8 (b) (4) (B) (apparently made by Congress in approval of the decisions of the Supreme Court) which, for the first time made certain union activities unfair, changed the words "employer" and "employee" to "person," and added the proviso as to primary strikes and picketing.

The complexity of distinguishing between unlawful secondary and protected primary activity is well illustrated by the case of *Carrier Corporation v. N. L. R. B.,* 311 F. 2d 135 (2d Cir. 1962). The Board had dismissed Carrier's charge that the unions which were in dispute with it had violated Sec. 8 (b) (4) (B) by picketing a gate which was on the property of a railroad near Carrier's plant, through which trains went to and from the plant. Judge Waterman wrote a thoughtful, exhaustive and soundly analytical opinion which found the Board wrong, essentially because the hearts of the pickets were not pure, in that they manifestly sought by their presence to prevent the rail-

road from handling Carrier's goods. Judge Lumbard dissented in another thoughtful opinion. On motion for reargument before nine Judges, six voted to deny and three to grant. The case went to the Supreme Court under the name of *United Steelworkers v. N. L. R. B.,* 376 U. S. 492, 11 L. Ed. 2d 863 (1964), and the Court reversed, and reinstated the order of the Board, holding that although the picketing complained of was literally within the proscriptions of a secondary boycott by Sec. 8 (b) (4) (B), it nevertheless was protected by the proviso in subsection (B) that nothing therein shall be construed to make unlawful, where not otherwise unlawful, "any primary strike or primary picketing."

We think the conflicting contentions of the Authority and the Unions involve determinations of fact, the drawing of inferences and the applications of law which Congress and the Supreme Court have said the National Labor Relations Board must do in the first instance. The Circuit Court, having been deprived of power to make the determination it made, as a basis for the granting of the preliminary restraining order and the permanent injunction, erred in restraining the conduct of the Unions.

The further supplementary contention of the Authority, that even if the Unions' activities violated the federal Labor Relations Act, the purposes of the Unions, to require the Authority to violate the law of Maryland, permitted the courts of Maryland to issue an injunction, seems foreclosed by the holdings of the Supreme Court. See the second *Garmon* case, the *Weber-Anheuser Busch* case and the *Curry* case, and compare the *United Steelworkers* case, all discussed earlier.

*Order reversed, with costs.*