Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 32-E, BUILDING SERVICE EMPLOYEES INTERNATIONAL UNION, AFL-CIO, Respondent.

United States District Court
S. D. New York.
Jan. 20, 1964.

Jacques Schurre, New York City, for petitioner National Labor Relations Bd.

Jacques Buitenkant, New York City, for respondent; Herbert A. Lien, New York City, of counsel.

McLEAN, District Judge.

This is a petition by the Regional Director of the Second Region of the National Labor Relations Board under Section 10(l) of the National Labor Relations Act (29 U.S.C. § 160(l)) for an injunction restraining respondent from picketing in alleged violation of Section 8(b) (7) (C) of the Act (29 U.S.C. § 158(b) (7) (C)), pending final disposition by the Board of an unfair labor practice charge filed against respondent by Dutch Lane Apartments Inc. ("Dutch Lane"). A hearing was duly held at which testimony was taken. I find the facts to be as follows:

Dutch Lane, a New York corporation, was organized in September 1962. Shortly thereafter it began to construct an apartment house at Spring Valley, New York. Dutch Lane acted as its own general contractor in this work. The building was to have six stories and to contain 77 apartments. The estimated construction cost was $750,000. Dutch Lane intended to operate the building after its completion. There is no evidence that Dutch Lane was engaged in any other construction projects or that it operated any other buildings.

By October 11, 1963, the project was 90 per cent completed. A temporary certificate of occupancy, good for thirty days, had been issued on September 20, 1963, and by October 11, approximately 35 tenants had moved in. Some construction work remained to be done, however, consisting of carpentry work, electrical work, masonry work and all the interior painting. A substantial quantity of fixtures remained to be installed, i. e., some electrical fixtures, louvers on the roof, and fixtures in the apartments themselves, i. e., kitchen cabinets, toilets, refrigerators and baseboards.

During the year from October 11, 1962 to October 11, 1963, materials, supplies and fixtures for the building having a value of more than $50,000 were delivered to the site from sources outside the state of New York. These included lumber, electrical materials, windows, railings and refrigerators.

On September 10, 1963 Dutch Lane hired Bates to be superintendent of the building. Prior to that date Dutch Lane had employed a laborer who had assisted in odd jobs in the course of the construction. After September 10 this laborer continued this work and also assisted Bates from time to time in his janitorial duties.

On September 27, 1963 respondent wrote to Dutch Lane asking it to communicate with respondent "to discuss the placement of Building Service Employees in the above premises." Dutch Lane ignored this letter. On October 5 a union representative, DiBucci, called at the premises and asked Eidelberg, president of Dutch Lane, to communicate with the Union about signing a collective bargaining agreement covering the superintendent Bates. Eidelberg did not comply.

On October 11, 1963, pickets appeared at the premises. They remained there continuously for some 35 days thereafter until a temporary restraining order was issued in this proceeding on November 15, 1963. For the first two weeks the picketing went on from 7:00 A.M. to 7:00 P.M. Thereafter pickets were present both day and night "around the clock." The pickets carried signs reading, "Does not employ members of Local 32E Building Service Employees International Union."

The picketing was orderly. There was no violence or rioting. On several occasions, however, the pickets induced persons employed by employers other than Dutch Lane not to deliver goods to the building and not to perform services in the building. In some instances these persons were truck drivers, as for example, drivers of United Parcel Service trucks, who came to the building to make deliveries to the tenants who had already moved in and who were induced by the pickets to refrain from doing so. Other instances involved persons who had to do with completing the construction of the building. Thus, the painters and carpenters refused to cross the picket line to complete their work. Drivers of lumber trucks were induced to refrain from delivering lumber. On one occasion a truckman delivering certain plastic spraying material was induced not to deliver it, and the same occurred in the case of a delivery of a truckload of refrigerators which were intended for installation in the apartments.

No petition under Section 9(c) of the Act was filed by the Union with the Board. On October 24, 1963 Dutch Lane filed with the Board its charge of alleged violation by the Union of Section 8(b) (7) (C).

Respondent opposes this petition on two grounds: (1) that there is not reasonable cause to believe that the Board will take jurisdiction of the unfair labor practice charge, and (2) that there can be no unfair labor practice on the facts of this case because an essential element of such a charge is the failure of the Union to file a petition for an election under Section 9(c) and here it would have been futile to do so because the Board has a settled policy against entertaining such petitions where a "one-man unit" is involved. Each of these contentions raises a serious question on which very little precedent can be found. After consideration, I have concluded that each contention should be disallowed and that the injunction sought by the Board should be granted.

■ As far as the jurisdictional question is concerned, it is clear that the Board has jurisdiction, if it chooses to exercise it. N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

In that case the Supreme Court upheld the jurisdiction of the Board over a dispute arising in the course of construction of a building, and it specifically stated (341 U.S. at 684, 71 S.Ct. at 949, 95 L.Ed. 1284):

"The fact that the instant building, after its completion, might be used only for local purposes does not alter the fact that its construction, as distinguished from its later use, affected interstate commerce."

■ But this does not dispose of the present problem, for the Board in some cases refuses to exercise the jurisdiction which it possesses. The question is whether it is so probable that the Board will refuse in this case as to make it unjust for the court to restrain the picketing pending the Board's decision.

The Board has announced certain criteria which will guide it in deciding whether to exercise jurisdiction in a given case. The statute, Section 14(c) (1) of the Act (29 U.S.C. § 164(c) (1)) prohibits the Board from declining jurisdiction of any labor dispute "over which it would assert jurisdiction under the standards prevailing upon August 1, 1959." The Board is permitted, however, to exercise jurisdiction, if it sees fit, over cases which do not come within those standards.

In considering whether the Board will take jurisdiction of this unfair labor practice charge, the fundamental question is whether it is realistic to view the situation as it existed in October 1963, as an unfinished construction job. Petitioner claims that it should be so treated. Respondent disputes this, and argues that by that date the construction was substantially completed and that we are really concerned here only with a residential apartment house. Either view is possible, but the fact remains that the construction was not wholly completed, that the building was not a fully functioning apartment house in the absence of interior painting, electrical fixtures, refrigerators and toilets, and that the picketing did prevent the completion of the work. On balance, I believe that it is sound to regard the project at that time as still in the construction stage.

On that basis, the question remains as to what standard the Board will apply to a construction job. As far as I have been able to ascertain, the Board has not announced a specific standard for such a case. Petitioner claims that the "non-retail standard" of an annual inflow of goods or services worth at least $50,000 should apply. There is some authority in support of this contention. Building and Construction Trades Council, 139 NLRB 1370 (1962); Carpenters Local Union No. 1028, 111 NLRB 1025 (1955).

On the evidence, the present case meets that test.

Respondent relies on Magic Mountain, Inc., 123 NLRB 1170 (1959) and High-land Tower, Inc., 1962 CCH NLRB Decisions ¶ 11940. In the first of these cases the Board declined jurisdiction of a dispute arising in the course of construction of an amusement park.

As far as appears from the brief opinion, the contention made here that the non-retail standard should apply to delivery of out of state materials, supplies and fixtures to the construction site was not raised.

In the second case, the Board declined to entertain an employer's petition for an election among its prospective building service employees where the building had not been completed at the time of the petition and there was no definite evidence as to what the annual inflow or outflow would be after the building was completed. The rationale of the decision is that the Board will not base jurisdiction upon a prediction as to future revenues.

Neither of these cases is determinative here. It is true that the court cannot be sure that the Board will assert jurisdiction of this charge. Only the Board can determine that. In my opinion there is sufficient likelihood that it will to justify the court in preserving the status quo until the Board has an opportunity to decide.

Now as to the second contention, i. e., the "one-man unit." On the facts I agree with respondent that for all practical purposes, only one man is involved. The evidence as to the activities of the handyman is unsatisfactorily vague, and in any event it appears that at best he devoted only part-time to work in the building.

The Board has held that it will not direct an election in a one-man unit. Al & Dick's Steak House, Inc., 129 NLRB 1207 (1961).

It does not necessarily follow, however, that the action of the Union in picketing and in interfering with access to the building without having filed a petition for an election, is not an unfair labor practice. It is noteworthy that in Al & Dick's Steak House, Inc., supra, al-

though the Board dismissed the petition for an election, it specifically stated that "We express no opinion, of course, as to whether the picketing involved in such charges is violative of 8(b) (7)." Whether it is or not is a matter for the Board to decide. What is the duty of the court in this situation? The only guidepost is McLeod v. Local 456 Teamsters (61 Civil 260), 42 L.C. ¶ 16,826 (S.D.N.Y. 1961). The court there granted the injunction, despite the Union's claim that only one man was involved. I believe that this decision should be followed at least until such time as the Board decides whether or not an unfair labor practice has been committed under these circumstances.

This opinion constitutes the court's findings of fact and conclusions of law.

The petition is granted. Settle order on notice.