HARRINGTON & COMPANY, INC., a corporation, et al., Plaintiffs,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, SUBORDINATE LOCAL NO. 1416, a labor organization, and International Longshoremen's Association, Subordinate Local No. 1922, a labor organization, Defendants.

Civ. No. 73–358.

United States District Court,
S. D. Florida.

April 5, 1973.

W. Reynolds Allen and Donald T. Ryce, Jr., Hogg & Allen, P. A., Coral Gables, Fla., for plaintiffs.

Seymour A. Gopman, Mamber, Gopman, Epstein & Foosaner, North Miami Beach, Fla., for defendants.

ORDER ON MOTION TO CLARIFY PRELIMINARY INJUNCTION, MOTION TO STRIKE AND REQUEST TO REOPEN

ATKINS, District Judge.

After an evidentiary hearing on March 6, 1973, this Court entered an Order preliminarily enjoining the defendants from

A. Calling, authorizing, causing, engaging in, sanctioning or assisting any slowdown, work stoppage and/or strike, or concerted refusal to perform services for Plaintiffs; and

B. Causing or attempting to cause the employees of Plaintiffs, or members of Defendants, to engage in any strike, work stoppage, slowdown or concerted refusal to perform services for Plaintiffs on account of any dispute or controversy that such Defendants may have with the Bahamian government and pending the further orders of this Court.

That injunction became of full force and effect at 5:00 p. m. March 7, when the plaintiffs posted with the Clerk's Office an Injunction Bond in the amount of Two Thousand Five Hundred Dollars ($2,500.00). Subsequent to the issuance and effective date of that preliminary injunction, the plaintiffs petitioned the Court for a Rule to Show Cause, and that petition was granted on March 8, 1973, with the hearing set for the following day. The Court took evidence at that hearing and at the close of the evidence announced from the bench its finding that International Longshoremen's Association, Subordinate Local No. 1416 [hereinafter referred to as Local 1416], a defendant herein and subject to the Court's preliminary injunction, was in contempt of that injunction and fined it One Thousand Dollars ($1,000.00). A written order followed that announcement setting forth the findings and conclusions that justified the Order Holding Defendants in Contempt.

This cause is now before the Court on the defendants' motion to clarify the preliminary injunction and the plaintiffs' motion to strike certain portions of the defendants' Memorandum Pursuant to Instruction of the Court. Also under consideration at this time is the request by the defendants that the Court reopen the record to enable the defendants to introduce further evidence that the defendants' conduct is arguably "labor dispute" within the meaning of Section 13 of the Norris-LaGuardia Act.

I

The Court entered into this dispute reluctantly, surrounded as it was by the much regulated and codified area of labor law. Vacillation or hesitation could not be tolerated, however. It was necessary for the Court, after reviewing the statutory and case law on the subject, to determine (1) whether jurisdiction existed and (2) whether the plaintiffs' complaint met the tests to justify injunctive relief.

Analysis of the complaint disclosed allegations of a breach of a contractual "no-strike clause"[1] by the defendants, both local unions of the International Longshoremen's Association, with that breach precipitated by the defendants' desire "to force or require the Bahamian government to release certain persons of Cuban desent [sic] held in custody by

---

1. The "no-strike clause" for Local 1416 is attached as appendix A as an example. The clause in the contract for Local 1922 is identical.

the Bahamian government." (Complaint p. 4) It was on this breach of the contract—more specifically, a concerted refusal to deal—that the plaintiffs predicated the Court's jurisdiction.

The first statute the Court must look to is Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, wherein it is provided that:

(a) *Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.*

There is no question concerning the effectiveness of the service of process, governed by another subsection. Also agreed to are the facts that the labor organizations are parties to valid contracts with the plaintiffs herein and that they represent employees in an industry affecting commerce. Section 301, however, is not the only statute relating to the Court's jurisdiction. Likewise relevant is Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104:

No Court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

\* \* \* \* \* \*

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

\* \* \* \* \* \*

(i) advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any such undertaking or promise as is described in Section 3 of this Act.

The withdrawal of jurisdiction to issue injunctive orders, then, applies to those enumerated activities "involving or growing out of any labor dispute." That term is more particularly defined in Section 13 of the Norris LaGuardia Act, 29 U.S.C. § 113, where the pertinent portions provide:

When used in this chapter, and for the purposes of this chapter—

(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; . . . .

\* \* \* \* \* \*

(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

Before a prayer for injunctive relief could be considered, a decision had to be made—was the controversy before the Court a labor dispute as defined by the above statute? If it was, the general grant of jurisdiction in Section 301 of the LMRA was withdrawn to the limited extent that no injunctive order could be issued.

 After having heard the testimony of the witnesses at the preliminary

injunction hearing and having reviewed the pleadings filed by the parties, a finding was made that "[t]his controversy [was] not a labor dispute within the meaning of the Norris-LaGuardia Act (29 U.S.C. § 101 et seq.), as more particularly defined in § 113 of Title 29, United States Code." The evidence adduced at that hearing convinced the Court that the strike was in fact based on the unions' dissent from the action of the Bahamian government concerning the arrest and incarceration of several of ILA Local 1964's members (not a defendant herein) for allegedly fishing inside the Bahamian territorial waters. While there understandably is not much case law interpreting the definition of a "labor dispute" in a similar context, the Court can turn to at least one such decision. The Court of Appeals for the Fourth Circuit in N.L.R.B. v. International Longshoremen's Ass'n, Local 1335, 332 F.2d 992 (4th Cir. 1964), was presented with a petition by the Board for enforcement of its cease and desist order entered against the defendant to prevent it from continuing an unfair labor practice. While the underlying facts are too lengthy for recitation here, suffice it to say that the local union defendant in that case refused to furnish labor to a ship that had been "blacklisted" by the Maritime Administration because it had been used in trade with Cuba. The shipowners, upon learning the reason given by the union for the refusal to refer workers to the ship, filed a complaint with the Board. Subsequently the Board petitioned a United States District Court, pursuant to 29 U.S.C. § 160(e), for an injunction, which

was granted, although stayed pending appeal.

The Court, in refusing to enforce the injunctive decree of the District Judge held that the Board did not have any jurisdiction over the disagreement because it was not a "labor dispute" within the meaning of the term as defined by the National Labor Relations Act.[2] After observing that "there can be no jurisdiction where the complaint presents a controversy unrelated to the resolution of a 'labor dispute' as defined," the Court went on to note:

> Essentially, [the owner's] grievance relates to actions of ILA which are political in nature. As the NLRB found, ILA was implementing a "clearly defined policy calculated to eliminate trade with Cuba." Dissatisfaction with ILA's policy of refusing to work ships that have engaged in trade with Cuba does not constitute a controversy grounded in the "terms and conditions of employment." Not every activity of a labor organization, not even every controversy in which it may become involved, is a "labor dispute" within the statutory meaning. Cf. N.L.R.B. v. Miranda Fuel Co., 326 F.2d 172, 180 (2d Cir. 1963). Terms and conditions of employment are not in dispute here. The union activity here pertains to a general political question, in which ILA shares an interest with all citizens. It is not seeking to alter any terms or conditions of employment.

332 F.2d at 995–996. While it is admitted that the resolution of that issue resulted in the holding that the Board did not have jurisdiction,[3] thereby prevent-

---

2. The definition in the Act is almost identical to the definition in issue here. *Compare* 29 U.S.C. § 113(c) *with* 29 U.S.C. § 152(9).

3. The Board further clarified its position in this type of situation in National Maritime Union, 147 N.L.R.B. 1317 (1964) where it stated:

> Furthermore, we have held that our jurisdiction is not predicated upon the existence of a labor dispute. Local 1355, International Longshoremen's As-

sociation (Maryland Ship Ceiling Company, 146 NLRB 732, enforcement denied 332 F.2d 992 (C.A.4). Although the Fourth Circuit, in reversing the cited case, disagreed, finding such a dispute to be essential, the Board respectfully adheres, until such time as the issue is finally resolved by the Supreme Court, to the view that its power to prevent unfair labor practices is not so qualified.

147 N.L.R.B. at 1317–1318, n. 3.

ing the application of the previously ordered injunction, this should not serve to dilute to soundness of this interpretation of the "labor dispute" definition as applied to these facts. Other circuits have criticized this particular decision, but the criticism has not been for the holding that this activity did not amount to a labor dispute, but rather for the underlying decision that a labor dispute is the "indispensable prerequisite to jurisdiction." See N.L.R.B. v. Twin City Carpenters District Council, 422 F.2d 309, 312–313 (8th Cir. 1970); National Maritime Union of America v. N.L.R.B., 120 U.S.App.D.C. 299, 346 F.2d 411, 415 (1965), and National Maritime Union of America v. N.L.R.B., 342 F.2d 538, 542 (2d Cir. 1965).

The cumulative effect of all these cases in this instance is merely that even though the District Court is not ousted from jurisdiction to entertain an injunctive complaint because the controversy complained of does not meet the strict test mandated for a "labor dispute," the Board still has concurrent jurisdiction to hear the complaint because a "labor dispute" in the strict sense is not necessary to justify the Board's exercise of jurisdiction.

█ In Defendant's Response to Motion to Strike, the issue is clouded by the assertion "that conduct over which the Board has jurisdiction is within its *exclusive* province to *initially* determine," citing San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L.Ed.2d 775 (1959). That, however, is not an absolute statement of the law, although *Garmon* is still good law in some instances. Reliance on *Garmon* resulted in the Michigan Supreme Court's affirming the dismissal by a lower court of a complaint for a breach of contract in Smith v. Evening News Asso., 362 Mich. 350, 106 N.W.2d 785 (1961). That decision was reversed by the Supreme Court based on the following reasoning:

Lucas Flour [Local 174, etc. v. Lucas Flour Co., 369 U.S. 95, 7 L.Ed.2d

593] and Dowd Box [Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483] as well as the later Atkinson v. Sinclair Refining Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L. Ed.2d 462, were suits upon collective bargaining contracts brought or held to arise under § 301 of the Labor Management Relations Act and in these cases the jurisdiction of the courts was sustained although it was seriously urged that the conduct involved was arguably protected or prohibited by the National Labor Relations Act and therefore within the exclusive jurisdiction of the National Labor Relations Board. In Lucas Flour as well as in Atkinson the Court expressly refused to apply the preemption doctrine of the Garmon case; and we likewise reject that doctrine here where the alleged conduct of the employer, not only arguably, but concededly, is an unfair labor practice within the jurisdiction of the National Labor Relations Board. *The authority of the Board to deal with an unfair labor practice which also violates a collective bargaining contract is not displaced by § 301, but it is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.* If, as respondent strongly urges, there are situations in which serious problems will arise from both the courts and the Board having jurisdiction over acts which amount to an unfair labor practice, we shall face those cases when they arise. This is not one of them, in our view, and the National Labor Relations Board is in accord. (footnotes omitted) (emphasis added)

Smith v. Evening News Asso., 371 U.S. 195, 197–198, 83 S.Ct. 267, 268–269, 9 L.Ed.2d 246 (1962). That holding was recently summarized favorably in Amalgamated Ass'n of St., Elec. etc., Motor Coach Employees v. Lockridge, 403 U.S. 274, 297–300, 91 S.Ct. 1909, 29 L.Ed. 583 (1971) and United States Bulk Carriers v. Arguelles, 400 U.S. 351, 358, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971) (Harlan, J.,

concurring). The limitation imposed on the scope of the *Garmon* pre-emption rule was explained in *Lockridge, supra,* as follows:

Nor can it be fairly argued that our resolution of respondent's final contentions entails simply attaching variegated labels to matters of equal substance. We have exempted § 301 suits from the Garmon principle because of the evident congressional determination that courts should be free to interpret and enforce collective-bargaining agreements even where that process may involve condemning or permitting conduct arguably subject to the protection or prohibition of the National Labor Relations Act. The legislative determination that courts are fully competent to resolve labor relations disputes through focusing on the terms of a collective-bargaining agreement cannot be said to sweep within it the same conclusion with regard to the terms of union-employee contracts that are said to be implied in law. That is why the principle of Smith v. Evening News is applicable only to those disputes that are governed by the terms of the collective-bargaining agreement itself.

403 U.S. at 300–301, 91 S.Ct. at 1925. *Cf.* Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167, 170 (5th Cir. 1971).

■ The dispute in this instance is governed by the terms of the collective-bargaining agreement—more specifically, the no-strike clause. The jurisdiction of this Court under § 301 is not destroyed. *Smith, supra,* 371 U.S. at 197, 83 S.Ct. 267.

## II

Once the jurisdiction of the District Court is established, it is necessary to determine whether the relief requested in the complaint is appropriate.

The plaintiffs prayed for both a preliminary and a permanent injunction to restrain the defendants from violating the "no-strike clause" of their contracts. Any injunction granted in this instance would have the effect of implementing the arbitration procedures spelled out in such detail in the contracts between the parties. Of course all of the parties involved knew

. . . that the purpose of a preliminary injunction is to preserve the status quo, 7 Moore Federal Practice ¶ 65.04[1], and that several factors must coalesce before the plaintiff may secure a preliminary injunction, including (1) that the plaintiff has no adequate remedy at law and will be irreparably harmed if the injunction does not issue; (2) that the balance of hardships tilts toward the plaintiff; and (3) that the plaintiff has at least a reasonable likelihood of success on the merits.

American Family Life Assur. Co. of Col. v. Aetna Life Ins. Co., 446 F.2d 1178, 1180 (5th Cir. 1971). One other factor recently verbalized by the same Court is "(4) whether issuance of a preliminary injunction will serve the public interests." Blackshear Residents Organization v. Romney, 472 F.2d 1197, 1198 (5th Cir. 1973).

The complaint alleged, and the evidence showed, that there was a breach of the "no-strike clause" of the contracts between the plaintiffs and defendants. In paragraphs 8 through 11 of the order granting plaintiffs' request for a preliminary injunction the Court found that these factors had coalesced in this instance, making such an injunction proper. No purpose would be served by reiterating those findings here.

After noting that "[a]ccording to the terms of the contracts, all grievances shall be settled by arbitration while the contracts remain in effect," the Court entered the injunction quoted earlier. In order to make perfectly clear the Court's intention to avoid any conflict with the anti-injunction statute dis-

cussed previously,[4] the injunction further provided that

This injunction is not intended to, nor will it, cover any bona fide "labor dispute" within the meaning of the Norris-LaGuardia Act that may arise subsequent to this date between the parties herein.

Following the issuance of the injunction and the Court's oral finding of contempt, the defendants filed a motion for clarification of the injunctive order reciting that both of the defendants

. . . are at a loss to determine what their obligations are pursuant to the Order entered by this Court under the circumstances presented here. Defendants have not been informed by the Court what actions would constitute a violation of the Court's Order and what, if anything, defendants are required to do to be in full and complete compliance with the Court's Order.

After summarizing the injunctive phrases, the defendants argued that no part of the Order dealt with the requirement that the members of the union cross a picket line.

 The short answer to this argument is that there was no such requirement. The injunctive order merely served to implement the "no-strike clause" of the contract. Subpart A of that clause itself provides "[t]he right of employees not to cross a *bona fide picket line* is recognized by the Employer." (emphasis added). The order would not, and under Section 301 could not, alter that provision. However it could, and did, require strict adherence to the condition that the picket line be "bona fide." If it was not a bona fide

picket line, the refusal to cross it would amount to "engaging in, sanctioning or assisting any slowdown, work stoppage and/or strike, or concerted refusal to perform services for plaintiffs . . . ." in violation of the "no-strike clause" and the injunction. Based on the testimony elicited at the Rule to Show Cause, the Court found that

The demonstration line at the Port of Miami was not a bona fide picket line as contemplated by the defendants' contracts with the plaintiffs; accordingly the defendants have no right to violate the injunction on the claimed basis that the demonstration by Local 1964 constituted a bona fide picket line.

In view of the fact that this result flows logically from the required findings and the injunctive order, there is no need to clarify the order itself. For that reason, the motion to clarify is denied.

### III

In moving to strike certain portions of the defendants' Memorandum Pursuant to Instruction of the Court, the plaintiffs note that the thrust of the memorandum seemed to be a request that the record in this cause be reopened in order to allow them a further opportunity "to demonstrate that a 'labor dispute' existed in the instant case." Noting further that paragraph 11 contained the statement that "no further evidence on the merits will be submitted to the Court," the plaintiffs argue that the memorandum is not responsive to the Order that "[t]he parties . . . herein will . . . submit to the Court briefs directed to the nature and form of a permanent decree to be en-

4. This attempt was made notwithstanding the plausible argument that the Court would have jurisdiction to enjoin the violation of the contract under the authority of Boys Markets v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), where the Supreme Court held that an injunction may be granted when (1) the contract between the parties does bind them to arbitrate

over the particular grievance in question and (2) a condition of the injunction will be that the employer is ordered to arbitrate the dispute. *Accord* International Union of Operating Engineers, Local 150 v. Flair Builders, Inc., 406 U.S. 487, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972) and International Union of Operating Engineers, Local 279 v. Sid Richardson Carbon Co., 471 F.2d 1175 (5th Cir. 1973).

tered in this matter," and should therefore be stricken.

■ There can be no misunderstanding regarding the purpose of the hearing held on March 5, in view of the Court's announcement at the outset.[5] While it is true that the hearing was set on short notice to the defendants, the President of Local 1416 was in the courtroom and available to testify. The Court would have been available to continue taking testimony the following afternoon if such a request had been made. The time to speak was then. *See* Eli Lilly and Co. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1106 (5th Cir. 1972). The defendants having waived their opportunity to controvert the plaintiffs' allegations, the Court should not now agree to hear further testimony.[6] Whether construed as a motion for a new trial, Director of Revenue, State of Colorado v. United States, 392 F.2d 307, 308–309 (10th Cir. 1968); United States v. Pan American World Airways, Inc., 299 F.2d 74, 76 (5th Cir. 1962), or as a motion for reconsideration, the defendants' motion must be denied.

■ Although the motion is without merit, it does not necessarily follow, as the plaintiffs suggest, that it should be stricken as well as denied. The motion to strike is not favored, 2A Moore's Federal Practice ¶ 12.21 (2d ed. 1972), and will not be granted in this instance.

Accordingly it is ordered and adjudged that:

(1) The defendants' motion to clarify the preliminary injunction order of March 6, 1973 shall be and it hereby is denied.

(2) The plaintiffs' motion to strike certain portions of the defendants' Memorandum Pursuant to Instruction of the Court shall be and it hereby is denied.

(3) The defendants' request to reopen the record in this cause to enable the defendants to introduce further testimony shall be and it hereby is denied.

## APPENDIX A

## NO STRIKE CLAUSE AND GRIEVANCE PROCEDURES

15.(A) During the term of this Agreement, The Employer agrees that there shall be no lockouts of the members of the Union and the Union agrees that there shall not be any strike of any kind or degree whatsoever, walkout, suspension of work, curtailment or limitation of production, slowdown, or any other interference or stoppage, total or partial, of the Employer's operation for any cause whatsoever; such causes including but not limited to, unfair labor practices by the Employer or violations of this Agree-

5. The transcript reflects that the following occurred at the beginning of the hearing:
THE COURT: All right. I should like to provide for trial of this action on the merits in advance of such trial and consolidate it with this hearing on the application for preliminary injunction. Is there any objection to that?
MR. GOPMAN: No, Your Honor. We would think that under the circumstances, the nature of this proceeding, that would be quite proper.
THE COURT: All right. You have no dispute with that, do you, representing the plaintiff?
MR. RYCE: No, sir.
THE COURT: Then under the provisions of Rule 65(a)(2) we will consoli-

date this hearing with the trial on the merits.
At the conclusion of the plaintiffs' case, the following conversations were had:
MR. RYCE: Your Honor, the plaintiff rests.
THE COURT: All right, the plaintiffs have rested. Do the defendants wish to offer any testimony?
MR. GOPMAN: No, sir, we don't have any evidence to offer.

6. There was a conscientious attempt by the Court in this case to question the witnesses following the conclusion of the direct and cross examinations in order to clear up any uncertainties. In several instances the length of this questioning exceeded that by the defendants.

ment. The right of employees not to cross a bona fide picket line is recognized by the Employer. The Union shall not be financially responsible for strikes or walkouts not authorized or assented to by the Union.

15.(B) Any grievance, dispute, complaint or claim arising out of or relating to this agreement, including all matters herein which expressly provide that they shall be dealt with in accordance with this Port, and including any dispute relating to the institution of new types of operation or changes in existing operations, or the application of this agreement, shall be handled and disposed of in the manner hereinafter provided, and all of the parties hereto agree to abide by any decision made in accordance therewith.

15.(C) When a grievance or dispute occurs, either the Management Representative (Stevedore, Pier Superintendent or appropriate designate of the Employer) or Union Ship Steward shall immediately call the problem to the attention of the other party. Meanwhile work 'shall continue. Each party shall use good judgment and make every effort to arrive at a settlement consistant with the contract.

Should there be agreement between those involved in the first paragraph of 15(C), the agreement reached shall be reported to the labor Relations Committee for its information. In the event the grievance or dispute relates to the interpretation or application of any provision of the contract, the agreement reached shall be subject to review and revision by the LRC to assure its conformance with the provisions of the contract involved; such review shall not include a reconsideration of the facts as established in connection with the agreement reached. In the event the LRC determines that the agreement reached relates to the interpretation

or application of a provision of the contract, they may either affirm or revise the agreement reached or either party may submit the matter to arbitration.

There shall be established a Joint Labor Relations Committee consisting of not more than three representatives of the Employers and not more than three representatives of the Union. The LRC shall meet weekly or as required on a stated day and at a stated time and shall be in general charge of the Grievance Machinery and the day to day relations between the ILA and the SEFEPA. This committee shall not only discuss and dispose of, on the basis of merit, all disputes referred to them, but shall have the power and authority, in the event of final disagreement and upon motion of either side, to refer any and all matters under disagreement to arbitration and arbitration shall be obligatory upon both the ILA and its locals and the members of the SEFEPA.

The LRC shall have the authority to generally review the relations between the parties and to make suggestions and recommendations for bettering such relations. The Committee shall also have the authority to recommend changes for next contract opening which are in the interest of clarity, better operations and production. The Committee shall also use its best efforts to prevent, wherever possible, disputes arising and shall exert every effort toward fair, equitable and reasonable relations.

15.(D) The Arbitrator shall be selected by the parties. Should the parties fail to agree upon an Arbitrator within fifteen days after the consummation of this agreement or such further time as shall mutually be agreed to, either side may request the Federal Mediation and Conciliation Service to submit a panel of seven (7) names. Each

side shall have the right to excuse three (3) of the names submitted and if one name remains, he shall be the Arbitrator. If more than one name remains, then the Director of the Federal Mediation and Conciliation Service shall select the Arbitrator from the remaining names. The Arbitrator shall function in that capacity for a minimum of one year. At the end of one year from the date of his selection, either side shall have the right to ask that the person so named be excused; and in that event a new Arbitrator shall be selected through the process above referred to. The Arbitrator selected at the end of such one-year period, whether he be the same person as was originally chosen or a new Arbitrator, shall serve out the remainder of the contract.

1. The Arbitrator shall be called upon only as heretofore outlined.

2. He shall adjudicate all matters before him on the basis of fact and customs and practice in effect, but shall at no time consider bona fide, a custom or practice which is instituted through job action, quickly or other unilateral action after the execution of the agreement, or which is in conflict with the contract.

3. He shall be empowered to render any decision he may deem appropriate on any matter before him which decision shall be final binding on both parties. Such decision must be issued within thirty (30) days after the completion of each arbitration proceeding unless both parties agree in writing to an extension of such time.

15.(E) PAYMENT OF EXPENSES AND OF FINANCIAL REQUIREMENTS. The parties shall bear equally the expenses of the arbitration procedure and of all other agreed upon expenses incurred in connection with the administration of the Plan.

It is understood and agreed that there will be no changes made in this Agreement except by mutual consent in writing and with the full knowledge of all members of the Joint Negotiating Committee. All interpretations of this Agreement will be made in accordance with the provision of Clause 15.

15.(F) The Union agrees that this Agreement is intended to cover all matters affecting wages, hours and other terms and conditions of employment and that during the term of this Agreement, the Employers will not be required to negotiate on any further matters affecting these or other subjects not specifically set forth in this Agreement. Anything not contained in this Agreement shall not be construed as being part of this agreement.