Michael F. WALSH, Acting Regional Director of the First Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO

and

Local 799, International Longshoremen's Association, AFL–CIO, Respondents.

Civ. A. No. 80–559–S.

United States District Court, D. Massachusetts.

April 30, 1980.

John S. May, Boston, Mass., for petitioner.

Joseph T. Doyle, Boston, Mass., for respondents.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

Petitioner commenced this action on March 27, 1980, seeking preliminary injunctive relief pursuant to § 10(1) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(1), pending final disposition of alleged unfair labor practices now before the National Labor Relations Board. The Board herein alleges, in support of its petition, that respondents have engaged in and continue to engage in conduct constituting a secondary boycott, in violation of §§ 8(b)(4)(i) and 8(b)(4)(ii)(B) of the Act, 29 U.S.C. §§ 158(b)(4)(i) and 158(b)(4)(ii)(B).

The facts are undisputed and may be briefly summarized. Allied International, Inc. ("Allied"), a Massachusetts corporation, is engaged in the import, purchase, and sale of wood products. Waterman Steamships Lines ("Waterman"), a New York corporation, transports freight to and from foreign and domestic ports, through the use of various oceangoing vessels of United States registry, including the WALTON, the MIDDLETON, and the JEFFERSON. John T. Clark & Son of Boston, Inc. ("Clark"), a Massachusetts corporation, is a stevedoring company, engaged in docking, loading and unloading oceangoing vessels in the port of Boston, and has been employed by Waterman to perform these services for all of its ships docking in Boston. The initial source of longshoremen for Clark's operations is a hiring hall operated by the respondents International Longshoremen's Association ("ILA"), and its Local 799, pursuant

to a collective bargaining agreement between the Boston Shipping Association and respondent unions.

Allied has contracted with two agencies of the Soviet Union for the purchase and transport of birch plywood and hardboard from the U.S.S.R. Pursuant to Waterman's contract with a third Soviet agency for the shipment of Soviet goods, Waterman and Allied have established the terms and conditions of Allied's shipments from the U.S.S.R. through direct negotiations.

On January 9, 1980, Thomas Gleason, President of respondent ILA, ordered union members to cease handling Russian ships and Russian cargoes, apparently in protest of the Soviet invasion of Afghanistan.[1] On that date, the WALTON was in Boston, unloading a portion of Allied's plywood and hardboard purchased from the Soviet Union, prior to further unloading at ports along the East Coast. Gleason informed Allied at that time that ILA members would not unload WALTON's cargo at any United States ports other than the port of Boston. As a result, Waterman cancelled the WALTON's scheduled calls, and unloaded all of Allied's wood products cargo in Boston, where it is currently stored, accruing demurrage and security charges. Waterman also restricted the cargo then being loaded onto the MIDDLETON in Leningrad to one-third its scheduled size, cancelled its delivery to scheduled United States ports, and unloaded the wood products in Montreal. In addition, Waterman has repudiated its agreement to transport Allied's wood products aboard the JEFFERSON. Allied subsequently made arrangements with a Soviet agency to transport its cargo on board two vessels of U.S.S.R. registry, scheduled to arrive in late April or early May 1980. Respondents informed Allied on March 12 and March 25 that no ILA members would unload any cargo originating in the U.S.S.R.

On February 26, 1980, March 6, 1980, and March 26, 1980, Allied filed charges with the Board alleging that the ILA and Local 799 were engaging in a secondary boycott, in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act, by forcing Clark to cease doing business with Waterman and Allied, Waterman to cease doing business with Allied, and Waterman, Allied, and Clark to cease doing business with the U.S.S.R. The Board here seeks a § 10(1) injunction pending resolution of these charges.

■ § 10(1) provides, in pertinent part: Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, . . . the preliminary investigation of such charge shall be made forthwith . . . . . If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudica-

---

1. The directive stated:

   In response to overwhelming demands by the rank and file members of the Union, the leadership of ILA today ordered immediate suspension in handling all Russian ships and all Russian cargoes in ports from Maine to Texas and Puerto Rico where ILA workers are employed.
   This order is effective across the board on all vessels and all cargoes. Grain and other foods as well as high valued general freight. However, any Russian ship now in process of loading or discharging at a waterfront will be worked until completion.

   The reason for this action should be apparent in light of international events that have affected relations between the U.S. & Soviet Union.
   However, the decision by the Union leadership was made necessary by the demands of the workers.
   It is their will to refuse to work Russian vessels and Russian cargoes under present conditions of the world.
   People are upset and they refuse to continue the business as usual policy as long as the Russians insist on being international bully boys. It is a decision in which the Union leadership concurs.

tion of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law.

Congress had determined that such preliminary relief may be critical to the effectuation of the purposes of the Act; traditional requirements for injunctive relief do not apply. *Union de Tronquistas de Puerto Rico v. Arlook*, 586 F.2d 872, 878 (1st Cir. 1978). The Regional Director must demonstrate (1) a reasonable cause to believe that an unfair labor practice has occurred, (2) legal theories to support the charge that are not "without substance", and (3) that a temporary injunction would be "just and proper" in light of the Act's purposes. *Arlook, supra*, at 876. The ultimate factual resolution is for the Board, subject to review by the Court of Appeals. *Hirsch v. Building & Constr., Trades Council of Phila. & Vic.*, 530 F.2d 298, 302 (3rd Cir. 1976); *Douds v. International Brotherhood of Teamsters*, 139 F.Supp. 702, 712 (S.D.N.Y. 1956). If this court is convinced that the theories advanced by the petitioner are wrong, it must deny injunctive relief. *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Wkrs. Union*, 494 F.2d 1230 (2d Cir. 1974).

*Issue Preclusion*

Before deciding whether the grounds exist to issue an injunction, I must first determine the legal effect of two prior federal court decisions arising out of this same dispute. On February 15, 1980, Judge Black of the Southern District of Texas denied a § 10(1) petition sought by the Board to require ILA members in the port of Houston to load grain destined for the U.S.S.R. *Baldovin v. Int'l Longshoremen's Assoc., AFL–CIO*, No. H–80–259 (S.D.Tex. Feb. 15, 1980). On March 4, 1980, Judge Edenfield of the Southern District of Georgia granted a § 10(1) petition covering the ports of Savannah and Brunswick. *Mack v. Int'l Longshoremen's Assoc., AFL–CIO*, No. CV 480 -051 (S.D.Ga. Mar. 4, 1980). The parties

here argue that I am bound under the doctrines of issue preclusion by one or the other of these decisions, choosing the opinion most favorable to their respective positions.

Under the judicially developed doctrine of *res judicata*, a final judgment "on the merits" bars a subsequent suit on the same cause of action by the same parties and their privies. Where the second suit between the same parties is upon a different cause of action, collateral estoppel precludes relitigation of issues actually litigated and determined in the prior suit. *Lawlor v. National Screen Service*, 349 U.S. 322, 326, 75 S.Ct. 865, 867, 99 L.Ed. 1122 (1955); *Commissioner v. Sunnen*, 333 U.S. 591, 597–8, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948). In *Baldovin* and *Mack*, as in the present case, the Board sought preliminary § 10(1) relief against the ILA and its locals. Although the different local unions may not be bound by decisions involving other ports, the Board might arguably have been estopped from filing a § 10(1) petition against the ILA once *Baldovin* was decided. Judge Edenfield in *Mack*, noting that the conduct complained of occurred after that covered by *Baldovin*, declined to apply *res judicata* to the case before him, because "subsequent conduct, even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action. *Kilgoar v. Colbert County Board of Education*, 578 F.2d 1033, 1035 (5th Cir. 1978)." Neither the case cited nor Judge Edenfield's opinion sheds any light on why the principle of collateral estoppel would not apply to the separate cause of action.

The decision in *Baldovin* turned on the issue of jurisdiction of the NLRB. The court there decided that the controversy did not relate to "commerce" as defined in the NLRA, citing *Windward Shipping (London) Ltd. v. American Radio Association, AFL–CIO*, 415 U.S. 104, 94 S.Ct. 959, 39 L.Ed.2d 195 (1974) and *American Radio Association, AFL–CIO v. Mobile Steamship Association, Inc.*, 419 U.S. 215, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974). Apparently, the

ships involved were of foreign registry, although that is not expressly stated in the opinion.

In *Mack*, Judge Edenfield did not feel bound by that decision, for the reason noted above. He held that the existence of a labor dispute is not an indispensable prerequisite to NLRB jurisdiction and that there was cause to believe that the defendants were engaged in a secondary boycott in that the defendants were "attempting to coerce Occidental Chemical [the consignee] to cease doing business with the Russians—by refusing to do longshoremen's work" for the stevedoring firms. It is not clear whether the ships involved were of United States or foreign registry. In any case, no attempt was made to distinguish *Baldovin* on that ground. I will make no such attempt either, because I do not consider the cases distinguishable on that ground.

■ If the doctrines of issue preclusion were to be strictly applied, I would be obliged to follow *Baldovin*, and treat *Mack* as having been wrongly decided on the issue of collateral estoppel. If these doctrines do not apply, I would follow neither case, because I consider both of them to be incorrectly decided for reasons that appear hereinafter. The doctrine of *res judicata* is said to be an equitable one. *Sweetheart Plastics, Inc. v. Illinois Tool Works, Inc.*, 439 F.2d 871 (1st Cir. 1971). In that case it was held to be inequitable to preclude the plaintiff from litigating its claim where the prior judgment was ambiguous. In this case equitable considerations are not apparent. I see no basis for varying the ordinary issue preclusion rules on equitable grounds if they would otherwise apply.

■ I am of the opinion, however, that the doctrines of *res judicata* and collateral estoppel by judgment do not apply to orders made in petitions under § 10(1). This preliminary proceeding seeks interlocutory re-

lief pending a full hearing by the Board. A district court decision, therefore, is not a final judgment and has no preclusive effect on the later determination of the merits. *National Labor Relations Board v. Denver Building & Constr. Trades Council*, 341 U.S. 675, 682–3, 71 S.Ct. 943, 948–949, 95 L.Ed. 1284 (1951); *National Labor Relations Board v. Acker Industries, Inc.*, 460 F.2d 649, 652 (10th Cir. 1972). The *res judicata* effect of one district court's § 10(1) decision upon another district court has not been expressly decided. *See Cosentino v. Local 28, Int'l Organization of Masters, Mates and Pilots, AFL–CIO*, 268 F.2d 648, 652 (8th Cir. 1959). Any possible preclusive effect of a § 10(1) decision would surely disappear, however, if the Board, after an unfair labor practice hearing, disagreed with the district court, and was upheld on appeal. As *Mack* and *Baldovin* were not true "final judgments" within the scheme of the Act, but merely ancillary to and in aid of the Board's jurisdiction, *res judicata* and collateral estoppel should not apply.[2]

*Jurisdiction*

In *Baldovin v. Int'l Longshoremen's Assoc., AFL–CIO, supra*, the court held that the picketing was not "in commerce", relying on *Windward Shipping (London) Ltd. v. American Radio Association, AFL–CIO, supra*, and *American Radio Association, AFL–CIO v. Mobile Steamship Association, Inc., supra*. In the cited Supreme Court cases, the picketing was in protest of wage scales paid on ships of foreign registry, which the Supreme Court held to be an internal matter affecting the management of foreign ships, and not "commerce." In *Baldovin*, and the present case, the controversy concerns the actual passage of goods from the U.S.S.R. to a consignee in the United States. In my view, this is clearly commerce, and clearly distinguishable from the cited Supreme Court cases. Accordingly, I decline to follow *Baldovin* on this issue.

---

2. I do not mean to suggest that a decision on traditional preliminary injunctive relief will not bind a second court faced with the same request by the same party based on identical issues. *See Lyon Ford, Inc. v. Ford Marketing Corp.*, 337 F.Supp. 691, 695 (E.D.N.Y.1971). In the usual case, however, the court determining preliminary relief will at some point also determine the merits; this latter function is specifically withheld from the district court in § 10(1) proceedings.

Respondents assert that the Board only has jurisdiction to act upon "labor disputes", so that a § 10(1) injunction may not issue to resolve a purely "political" dispute between the ILA and the Soviet Union. Petitioner maintains the Board need only show "reasonable cause" as to the existence of an unfair labor practice, which necessarily includes a rational basis for jurisdiction.

The Fourth Circuit Court of Appeals was faced with a similar controversy in 1964, when the ILA refused to load or unload any vessels engaged in trade with Cuba, during the height of the missile crisis. In *National Labor Relations Board v. Int'l Longshoremen's Assoc. (Ocean Shipping Service)*, 332 F.2d 992 (4th Cir. 1964), Judge Sobeloff held that the Act only conferred Board jurisdiction over resolutions of "labor disputes", as defined in § 2(9), 29 U.S.C. § 152(9). Section 10(1) relief could not be granted where no "terms and conditions of employment" were involved, an "indispensable prerequisite to jurisdiction." 332 F.2d at 996. Subsequent decisions have read this opinion narrowly so as to allow § 10(1) relief where the "labor dispute" was between two unions, rather than between union and employer. *National Labor Relations Board v. Twin City Carpenters District Council*, 422 F.2d 309, 312–3 (8th Cir. 1970); *National Maritime Union of America, AFL–CIO v. National Labor Relations Board*, 342 F.2d 538, 541 (2d Cir.), *cert. denied*, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965). The Board and the D.C. Circuit Court of Appeals have rejected the proposition that the definition of a labor dispute in § 2(9) was intended by Congress to limit the Board's jurisdictional authority. *National Maritime Union of America, AFL–CIO v. National Labor Relations Board*, 346 F.2d 411, 414–6 (D.C.Cir.1965); *National Maritime Union*, 147 N.L.R.B. 1317, 1317–8 n.3 (1964).

■ In light of this conflicting authority, I find that the Board has shown "reasonable cause" to believe jurisdiction exists in the present case. This standard has been applied to determinations of jurisdiction in § 10(1) proceedings, where the exercise of jurisdiction depends upon discretionary policy of the Board, *Hoffman v. Retail Clerks Union, Local 648*, 422 F.2d 793, 795 (9th Cir. 1970); *McLeod v. Local 32–E, Building Service Employees Int'l Union*, 227 F.Supp. 242, 244–5 (S.D.N.Y.1964), or where the Board resolves mixed questions of law and fact, *Compton v. National Maritime Union of America, AFL–CIO*, 533 F.2d 1270, 1274–5 (1st Cir. 1976) (Board exercised jurisdiction over private contractor found to be not within "political subdivision" exemption of the Act); *Madden v. Int'l Organization of Masters, Mates and Pilots of America, Inc.*, 259 F.2d 312 (7th Cir.), *cert. denied*, 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229 (1958) (Board finding that labor organization and employees were covered by the Act was reasonable cause for asserting statutory jurisdiction). Even though the issue is a purely legal one here, where there is conflicting authority it should not be resolved by the district court in a § 10(1) hearing, given the Board's traditional power to determine its own jurisdiction in unfair labor practice proceedings, subject to review by the Court of Appeals.

*The Unfair Labor Practice*

Petitioner alleges that he has reasonable cause to believe respondents are engaging in a secondary boycott in violation of §§ 8(b)(4)(i) and (ii)(B) of the Act. Those sections provide:

(b) It shall be an unfair labor practice for a labor organization or its agents—

\*      \*      \*      \*      \*      \*

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

\*      \*      \*      \*      \*      \*

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

These provisions were adopted to prevent union coercion of neutral employers to induce them to cease doing business with the "primary" employer with whom the union has a dispute. *National Woodwork Manufacturers Association v. National Labor Relations Board,* 386 U.S. 612, 624, 87 S.Ct. 1250, 1257, 18 L.Ed.2d 357 (1967). The Supreme Court has adopted a three-part test to determine a violation of these sections: "Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person." *Local 1976, United Brotherhood of Carpenters v. National Labor Relations Board,* 357 U.S. 93, 98, 78 S.Ct. 1011, 1015–1016, 2 L.Ed.2d 1186 (1958). Using this broad language, the Board here argues that the ILA is inducing its members to refuse to work for Clark, to force Clark to cease doing business with Waterman, or to force Clark, Waterman, and Allied to cease doing business with the U.S.S.R.

The First Circuit has recently stated that, despite the broad terms of the Act, ". . . the statutory prohibition only applies when employees of a secondary employer are induced to strike or . . . to use other economic pressures against their employer in order to aid a union that has a dispute with another employer." *Mishara Constr. Co. v. Int'l Brotherhood of Electrical Workers, AFL–CIO,* 554 F.2d 488, 491

(1st Cir. 1977). This statement would seem to require a dispute with a primary employer before a violation of §§ 8(b)(4)(i) and (ii)(B) could be found.[3] Other circuits, emphasizing Congressional concern over the protection of neutral employers from outside disputes, have awarded relief without requiring any primary employer dispute. *National Maritime Union of America, AFL–CIO v. National Labor Relations Board,* 346 F.2d 411 (D.C.Cir.1965); *National Maritime Union of America, AFL–CIO v. National Labor Relations Board,* 342 F.2d 538 (2d Cir.), cert. denied, 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965) (inter-union dispute resulted in secondary boycott). The Board has cited no case, however, where a purely political dispute has provided the basis of a secondary boycott.[4] The Supreme Court has stated, "Congressional concern over the involvement of third parties *in labor disputes* not their own prompted § 8(b)(4)(B)." *National Labor Relations Board v. Local 825, Int'l Union of Operating Engineers, AFL–CIO,* 400 U.S. 297, 302, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971) (emphasis added). Just as the proviso to § 8(b)(4)(ii)(B) demonstrates Congressional intent to exclude traditional primary strike activity from the prohibitions of that section, so may a court infer that the provision should be construed narrowly to not prohibit the exercise of political protest by a union and its members.

■ Even if I were not to treat the First Circuit's strictures concerning a "primary employer" dispute, as a binding determination of the issue, *see* n.3 *supra,* I could not issue an injunction here. The ILA has not induced a strike against Allied, Waterman, or Clark; nor does it seek to pressure those employers not to deal with one another. No picket lines have been established and no other employees have been prevented from work. Union members have simply

---

**3.** This statement was made in a different context. It is not clear whether it was intended as a limitation on the scope of §§ 8(b)(4)(i) and (ii)(B) or as a description of the typical situation to which these sections are directed.

**4.** In *Harrington & Co., Inc. v. Int'l Longshoremen's Assoc., Subordinate Local 1416,* 356

F.Supp. 1079 (S.D.Fla.1973), the district court enjoined a dock strike arising from the Bahamian government's arrest of certain ILA members. That injunction was imposed as a result of the Union's breach of a no-strike provision in its collective bargaining agreement; no secondary boycott was involved.

declined to accept employment on certain ships, as a form of political protest. I am persuaded by Judge Soboloff's reasoning in the *Ocean Shipping* case: "Indeed, if the bare refusal to work in the circumstances shown should be held illegal, the union would be deprived of its right of expression and the proviso of Section 8(b)(4)(ii)(B) would be emptied of meaning." 332 F.2d at 997. This is a primary boycott of Russian goods, with incidental effects upon those employers who deal in such goods. As such, the actions of respondents may not be prohibited by §§ 8(b)(4)(i), (ii)(B).[5] *National Woodwork Manufacturers Assoc. v. National Labor Relations Board*, 386 U.S. at 627, 87 S.Ct. at 1259. In *Mack v. Int'l Longshoremen's Assoc., AFL–CIO, supra*, the court characterized the picketing as being directed against the consignee. For the reasons stated, I do not believe that this is a correct analysis and decline to follow it.

I find that the policies of the Act would not be effectuated by prohibiting the respondents' exercise of political expression. I further find that the Board's characterization of this primary boycott as falling within the proscriptions of §§ 8(b)(4)(i), (ii)(B) does not constitute "reasonable cause." Accordingly, the petition for an injunction under 29 U.S.C. § 160(1) is DENIED.

---

5. Petitioner's contention that a secondary boycott exists through the inducement of Allied and Waterman to "cease doing business" with the U.S.S.R. must fail, as the U.S.S.R. cannot be characterized as "any other person" under the statute.